**In the Interest of W.D.W., a Child.**

No. 05–04–01254–CV.

Court of Appeals of Texas,
Dallas.

Sept. 22, 2005.

Avo S. Butler, Law Office of Avo Stevens Butler, Sherman, for ad litem.

John Hunter Smith, Nall, Pelley & Wynne, L.L.P, Sherman, R.J. Hagood, Denison, for Appellants.

Karla R. Baugh, Assistant County Attorney, Stephen Love, Grayson County Attorney's Officer, Sherman, for Appellee.

Before Justices FITZGERALD, LANG–MIERS, and MAZZANT.

## OPINION

Opinion by Justice LANG–MIERS.

The Texas Department of Family and Protective Services (the Department) filed

an action to terminate the parent-child relationship between the parents, G____ W____ (Mother) and B____ W____ (Father), and the minor child, W.D.W., under the procedures provided in Texas Family Code Chapter 161. The jury found the parents' rights should be terminated, and the trial court rendered judgment according to the verdict. On appeal, both parents challenge the legal and factual sufficiency of the evidence and the admission of the testimony of the Department's expert. We affirm.

### LEGAL AND FACTUAL SUFFICIENCY

A trial court may terminate the parent-child relationship if the fact finder finds by clear and convincing evidence (1) a parent committed one or more of the enumerated statutory acts or omissions, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). Due process requires that each finding be based on clear and convincing evidence. *Id.* § 161.206(a). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. This level of certainty is necessary to preserve the fundamental fairness in government-initiated proceedings that threaten to end a natural parent's desire for and right to custody, care, and management of his or her children. *In re S.P.,* 168 S.W.3d 197, 202 (Tex.App.-Dallas 2005, no pet. h.).

■ In reviewing the legal sufficiency of the evidence to support a termination finding, we look at all of the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002). In doing so, we presume the fact finder "re-solved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* As a corollary to this, we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* After conducting this review, if we determine "no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, [we] must conclude that the evidence is legally insufficient." *Id.*

■ In reviewing the factual sufficiency of the evidence, we look at all of the evidence and "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* We "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* After such a review, if we conclude the disputed evidence that the fact finder "could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

### Mother and Father's Acts or Omissions

■ The Department sought to terminate the parental rights of Mother and Father because they (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the child's physical or emotional well-being, or (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the child's physical or emotional well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(D) & (E).

Father argues no rational trier of fact could have found by clear and convincing evidence that he engaged in any of the allegations asserted in the Department's

petition. Mother did not file a separate brief but rather adopted Father's brief.

The evidence showed that Mother has four children, two of whom she had when she was very young. She gave those two older children to her grandmother to raise. During the investigation of this case, her grandmother told the Department that Mother was not feeding the children before grandmother took over their care. Although Mother testified she talks with these children regularly, the record contained no evidence she made any effort to see the children on a regular basis.

Mother left home as a teenager, without the children, and traveled with friends who drove commercial tractor trailers on long-haul trips. On one of these trips, she met Father, a truck driver. They were married, Mother gave birth to J.W. in October 1993, and the family moved to Oklahoma. W.D.W. was born in Oklahoma in February 1999. Although the evidence conflicted regarding the exact time, at some point after W.D.W. was born, J.W. was removed from the home based on allegations of physical abuse by Mother and Father and sexual abuse by Father's brother, S____ W____ (the uncle). Prior to J.W.'s removal, the parents were informed of the allegations that the uncle abused J.W., but they continued to allow the uncle to visit.

Mother completed parenting classes in an effort to regain custody of J.W., but the record contained no evidence that Mother or Father complied with any other conditions required by Oklahoma to reunite the family. In the meantime, Mother and Father moved back to Texas with W.D.W. where they lived with Father's family, including the uncle, S____ W____, and Father's brother, M____ W____, and sister-in-law. In January 2004, a jury in Oklahoma terminated Mother and Father's parental rights to J.W.

Mother and Father frequently took W.D.W. on their long-haul trips. W.D.W.'s baby seat was "bungie strapped" to the back seat and W.D.W. often wiggled out of his seat and crawled up to the front. Mother admitted that she and Father used methamphetamine intravenously for the past twelve years, even while driving with W.D.W. And although she testified she never let W.D.W. out of her sight, Mother later admitted she left W.D.W. with M____ W____ and his wife, who were also drug users and lived with the uncle, and the evidence showed that W.D.W. was left in the uncle's care at least once.

During their thirteen years of marriage, Father frequently assaulted Mother in front of W.D.W., sometimes hitting her with his fist and other times hitting her with his open hand. He also "chocked," kicked and dragged her. Father was arrested three times since W.D.W. was born, and served one year of probation for family violence. He used to smoke marijuana and injected methamphetamine off and on since he was eighteen. Mother was convicted of food stamp fraud, but denied committing the crime. After failing to comply with the conditions of her probation, Mother admitted to a methamphetamine addiction and was sentenced to a substance abuse felony punishment facility, where she was still incarcerated during the trial of this case. When asked whether she was "stoned most of the time" when she and Father fought, Mother said "yes."

The Department visited Mother and Father's home three times prior to W.D.W.'s removal from the home. On two of these occasions, a home study was conducted by a Texas caseworker, Donna Lovelace, for Oklahoma in its case concerning removal of J.W. from the home. While Lovelace was at the parents' house the first time, W.D.W. was in his crib for two or three hours, with only a plastic mattress cover

on the crib—no sheet, no toys, no pillow. He did not cry; he only sat in the crib and talked to himself. On the second occasion, Lovelace saw W.D.W. in the crib with a "onesy" on but no diaper. W.D.W. had defecated and had smeared it over his head and body. Mother told Lovelace W.D.W. had removed his diaper from under his "onesy," but Lovelace thought it was impossible for the child to do that and there was no evidence she saw a diaper in the room. Even though the house was "appropriately clean," Lovelace called the Department's hotline after she left because of her concern about what she saw.

T⎯⎯ K⎯⎯ testified that in April 2003, when W.D.W. was about four, Mother and Father asked if her 15–year–old daughter could babysit W.D.W. for a few days. T⎯⎯ K⎯⎯ agreed to help her watch the child. T⎯⎯ K⎯⎯ was an old school mate of Father's. He knew she had used drugs in the past but said she had "cleaned up." T⎯⎯ K⎯⎯ testified she was recently indicted for abandonment and endangerment of children, and had used marijuana, cocaine, and methamphetamine in the past. She testified her last drug use was in February 2003. T⎯⎯ K⎯⎯ was involved in two car accidents, one of which killed her son. She was diagnosed with post traumatic stress disorder, flashbacks, and aggression, for which she was taking several mood stabilizers.

T⎯⎯ K⎯⎯'s roommate was also a drug user and testified she used marijuana the day Mother and Father dropped W.D.W. off at T⎯⎯ K⎯⎯'s house. The roommate also used cocaine and admitted she had a "bad drug problem." T⎯⎯ K⎯⎯ said she overheard Mother and Father talking to her roommate about a sexual threesome involving methamphetamine. The roommate admitted that either Mother or Father mentioned they smoked "ice,"

but denied the conversation about trading sex and about a sexual threesome.

Mother and Father left T⎯⎯ K⎯⎯ enough clothes for W.D.W. for about two or three days. They left no emergency number where they could be contacted. The only number she had was for Father's parents. According to T⎯⎯ K⎯⎯, one of the first things Mother and Father told her when they dropped off W.D.W. was not to be surprised if he tried to stick a corn dog or hot dog "up his bo-bo." During the time that T⎯⎯ K⎯⎯ had W.D.W., he sexually acted out and exhibited other unusual behaviors. Following one of these episodes, W.D.W. told T⎯⎯ K⎯⎯ that Father and the uncle sexually abused him. T⎯⎯ K⎯⎯ called the Department and the police. When the Department interviewed W.D.W. at T⎯⎯ K⎯⎯'s home, W.D.W. told the investigator that Mother, Father and the uncle sexually abused him. The Department took custody of W.D.W. before Mother and Father returned from their trip.

Mother and Father did not attempt to visit W.D.W. when they returned from their trip. Father did not work with the caseworker on completing his service plan because he was always on the road. The evidence showed Father did not complete any of the goals of the service plan. Even after their parental rights to J.W. were terminated, in part because of the uncle's sexual abuse of J.W., Mother and Father still allowed the uncle to be around W.D.W. And it was unclear whether Father ever believed the uncle sexually abused W.D.W.

Father has been unemployed since October 2003 and has made no contribution to the support of W.D.W. since he was removed by the Department. Prior to October 2003, Father's employment history was unstable. He lost jobs because he was a "serious traffic violator," because he was

in jail, and because he had problems with other company employees. Although he said he has given up looking for a job, he also testified that he has a truck driving job lined up when this case is over and when a truck becomes available.

Mother did not comply with her service plan because she has been "locked up." However, she testified she is taking classes in anger management and parenting while incarcerated and is working in the laundry. She said she hopes to obtain her GED before she is released.

In summary, the evidence showed that Mother and Father consistently abused drugs and drove commercial trucks while using drugs with the child in the vehicle. Mother and Father allowed drug users to babysit W.D.W., sometimes for long periods of time, without leaving an emergency number where they could be contacted. Father repeatedly abused Mother in the presence of the child. Mother and Father allowed the child to be around the uncle even after their parental rights to another child had been terminated, in part, due to sexual abuse by this same uncle. And they refused to comply with any of the conditions for regaining custody of W.D.W.

We conclude the evidence is legally and factually sufficient to support the jury's finding that Mother and Father engaged in conduct which endangered the physical or emotional well-being of the child or knowingly placed the child in conditions or surroundings which endangered the physical or emotional well-being of the child. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987) (parent's conduct need not be directed at child or result in injury to child to constitute endangerment; specific danger to child's well-being may be inferred from parental misconduct); *In re R.W.*, 129 S.W.3d 732, 739 (Tex.App.-Fort Worth 2004, pet. denied) (conduct that subjects child to life of uncertainty or instability endangers child's well-being; drug use may establish endangering course of conduct); *In re D.M.*, 58 S.W.3d 801, 812 (Tex.App.-Fort Worth 2001, no pet.) (instability and incarceration can be continuing course of conduct supporting termination).

### The Child's Best Interest

■■ We now turn to whether termination was in the best interest of the child. In doing so, we consider the following factors: the child's desires, the child's present and future emotional and physical needs, the present and future emotional and physical danger to the child, the parenting abilities of the persons seeking custody, the programs available to the persons seeking custody to help promote the best interest of the child, the plans for the child by those persons seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976); *In re J.A.*, 109 S.W.3d 869, 876–77 (Tex.App.-Dallas 2003, pet. denied).

The evidence showed that W.D.W. was physically and emotionally abused by his Mother, Father and uncle. He also observed Mother physically abused by Father. Mother and Father used drugs while driving commercial vehicles with the child. They placed him around people who used drugs and who sexually abused him. Mother left W.D.W. alone in his crib for hours with no toys to stimulate him and no sheet on the mattress.

Foster parents testified they observed W.D.W. exhibit unusual behaviors and sexually acting out. Tests showed W.D.W. was developmentally delayed. At age four, he was unable to articulate complete

sentences. He was also overly friendly with strangers and exhibited no "stranger danger." He hugged strangers and told them he loved them. Tests also revealed he suffered from post traumatic stress disorder and showed very strong signs of reactive attachment disorder. According to the Department's expert, Dr. James Harrison, reactive attachment disorder develops from age eighteen months to five or six years of age and results from the child failing to develop a trust in adults that the child will be cared for consistently and reliably and will be loved and not hurt. Disruption in this trust development can arise in abusive situations, whether the abuse is directed toward the child or another family member.

Dr. Harrison testified that treatment of reactive attachment disorder is a long-term process involving therapy and extensive training with the primary care giver and possibly medication to manage the child's moods. Dr. Harrison testified that if W.D.W. witnessed Father beating Mother throughout the child's life, this could have caused both post traumatic stress disorder and reactive attachment disorder. He also testified that the behavior W.D.W. exhibited strongly indicated sexual abuse. According to Dr. Harrison, some of W.D.W.'s symptoms also could have resulted from a neurological disorder caused by the mother's prenatal drug experience, birth problems, or physical abuse.

Mother and Father offered the testimony of Dr. Cynthia Martin–Cannici, who disagreed with some of Dr. Harrison's conclusions. She testified that the psychological bond between a mother and child "is important enough that you would want to do anything you could not to break it." She said putting the child in the most excellent home one could find would be more damaging for the majority of children "than being with parents who have

some deficiencies." However, she admitted that a child who was sexually abused in the family is a "big problem" and that a parent who left a child unattended for hours in a crib would be a cause for intervention.

The evidence showed that after W.D.W. was removed from his parents, he was transferred to three different foster homes in an effort to find a place that could treat his physical and emotional issues. After the third home, W.D.W. was admitted to the psychiatric ward of a hospital for three weeks. Upon release, the doctor recommended placement in a residential treatment facility because he did not feel any foster parent could handle W.D.W. in his current state. At the time of trial, W.D.W. resided in a residential treatment facility designed to treat children like him. And even though progress was slow, testimony showed that W.D.W. had made some progress. The Department testified its ultimate goal is for W.D.W. to be adopted.

Mother did not offer any plans for taking care of W.D.W. And she contradicted herself when asked about her plans to return to the marriage. At first she testified she did not know what she wanted to do, because she loved Father and thought he was a good father and provider. Then she testified she always wanted a divorce but was afraid to leave because Father had threatened to kill her if she divorced him. Later she testified she planned not to return to Father after she is released.

Father expressed remorse over his abuse of Mother, but seemed unwilling to admit that the uncle could have molested his children. He expressed no plans for obtaining a job to support his family other than he was waiting on a job as a truck driver. He offered no evidence of stable employment or home life. He excused his failure to work on the goals in the Department's service plan because he was on the

road all the time. But he offered no excuse for not working on the goals after he became unemployed, other than he has given up. The record contained no evidence that Mother or Father visited W.D.W. at any point after his removal from their home.

During the Department's home study with respect to J.W., Father told Lovelace that if he caught J.W. masturbating in public, he would tell him to go to his room to do that. Mother said if she caught him sticking objects in his rectum, she would find pictures of children dying from AIDS or leukemia, show him the pictures, and tell him that is what would happen to him if he did not stop. Although this related to another child, J.W., not W.D.W., Mother and Father offered no evidence that their plans for W.D.W. and his similar behavior were any different. A parent's conduct both before and after a child is born is relevant to the determination of whether the conduct endangers the child's physical or emotional well-being. *In re S.P.*, 168 S.W.3d at 203.

Additionally, Father and Mother did not provide stable employment or a stable home environment for W.D.W., living mostly on the road. And when they knew their parental rights were in jeopardy, they made no effort to complete any of the goals in the service plan for the return of W.D.W. to the family.

We conclude the evidence is both legally and factually sufficient to support the jury's finding that termination of Mother and Father's parental rights was in the best interest of W.D.W. We overrule appellants' first issue.

### WHETHER EXPERT'S TESTIMONY SHOULD HAVE BEEN EXCLUDED

■ In their second issue, Mother and Father argue the trial court abused its discretion by allowing Dr. Harrison to testify as an expert because he was not properly disclosed by the Department.

■ Rule 194 of the rules of civil procedure governs the disclosure of information about testifying experts and their reports. *See* Tex.R. Civ. P. 194.2(f). The purpose of rule 194 requiring pretrial disclosure of expert witnesses is to give the opposing party sufficient information about the expert's opinions to prepare for cross-examination of the expert and to present rebuttal evidence from its own experts. *See Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex.1993); *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 348 (Tex.App.-Fort Worth 2003, pet. denied).

■ We review a trial court's decision concerning discovery sanctions under an abuse of discretion standard. *See Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex.1986). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). In other words, we must determine whether the trial court's action was arbitrary or unreasonable. *See id.* at 242.

Prior to trial, Mother and Father filed a motion to strike the Department's expert witnesses based on a failure to comply with rule 194. Following a hearing, the trial court struck all of the Department's experts except Dr. Harrison.

The evidence showed that the Department answered appellants' requests for disclosure, designating Dr. Harrison as an expert who conducted a neuropsychological evaluation of the child. Attached was Dr. Harrison's curriculum vitae. In its response, the Department referred to the "Child Protective Services Case file previously provided" to appellants for information regarding the subject matter of his

testimony, the general substance of his mental impressions and opinions and summary of the basis for those opinions, and tangible information he reviewed or prepared in anticipation of his testimony. The Department showed that Dr. Harrison's report containing the general substance of his mental impressions and opinions and summary of the basis of those opinions had been previously produced to Mother and Father in discovery.

Father admitted he received Dr. Harrison's report prior to trial. And he does not argue the disclosure was not timely or the report was not adequate. Father also admitted he was not surprised by Dr. Harrison's testimony. In fact, he hired his own expert to rebut Dr. Harrison's testimony. However, Mother and Father contend the Department should have attached Dr. Harrison's report to its response to the disclosure request, rather than referring to a file already produced in discovery. Father also contends the disclosure fails to include any documents, tangible things, reports, models, or other data compilations reviewed by or prepared by or for Dr. Harrison in anticipation of his testimony, and did not identify whether he was a testifying or consulting expert. Failure to do so, they contend, violated rule 194.

Mother and Father rely on *VingCard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847 (Tex.App.-Fort Worth 2001, pet. denied) in support of their argument. In *VingCard*, the respondent provided only the expert's name and subject matter of his testimony in response to a rule 194 discovery request. Merrimac did not disclose the expert's mental impressions or opinions, a brief summary of the bases for those opinions, or any of the tangible information the expert reviewed in anticipation of his testimony. The trial court overruled VingCard's objection when Merrimac offered the expert's testimony at trial. The

Fort Worth Court of Appeals concluded that Merrimac failed to comply with rule 194, which, absent a showing of good cause or lack of surprise or prejudice, triggered the automatic exclusion sanctions of rule 193.6. *Id.* at 856; Tex.R. Civ. P. 193.6. Because Merrimac made no attempt to show good cause or lack of surprise or prejudice, the court concluded the expert's testimony should have been excluded. However, the court held that any error was harmless.

Unlike *VingCard*, here the Department produced Dr. Harrison's report, which complied with rule 194, to Mother and Father before it responded to the discovery request. Additionally, Father's counsel candidly admitted during argument that Dr. Harrison's report was sufficient under case law to meet the requirements of rule 194 and that he was not surprised. Instead, he contended the disclosure response did not satisfy the spirit of the rule. But even if the Department's disclosures had not complied with rule 194, there was a lack of prejudice in this case because neither Mother nor Father objected to the introduction of Dr. Harrison's report, when it was offered by the child's attorney ad litem, which contained the same opinions as offered in his testimony.

Because the report complied with the rule, Mother and Father received the report prior to trial which gave them the opportunity to prepare their rebuttal, neither parent objected when the child's ad litem introduced the expert's report into evidence, and Mother and Father offered their own expert's opinion in rebuttal, we conclude the trial court did not abuse its discretion in admitting Dr. Harrison's testimony. We overrule appellants' second issue.

### Conclusion

We conclude the evidence is legally and factually sufficient to support the jury's

finding that termination of Mother and Father's parental rights was in the best interest of the child. We further conclude the trial court did not abuse its discretion in allowing Dr. Harrison to testify as an expert for the Department. Having overruled both of appellants' issues, we affirm the judgment of the trial court.