225 S.W.3d 621 (2006)
In the Interest of J.A.J.
No. 14-04-01031-CV.
Court of Appeals of Texas, Houston (14th Dist.).
August 10, 2006.
Opinion Dissenting on Denial of Rehearing May 10, 2007.
*622 William B. Connolly, Houston, for appellant.
*623 Sandra D. Hachem, Houston, for appellee.
Panel consists of Justices YATES, HUDSON, and Senior Justice MARGARET G. MIRABAL (sitting by assignment).
Opinion Dissenting on Denial of Rehearing En Banc May 10, 2007.

MAJORITY OPINION ON REHEARING
J. HARVEY HUDSON, Justice.
Our previous opinion in this cause delivered on December 13, 2005, is withdrawn and substituted with this opinion on rehearing.
Angeline Jackson, mother of J.A.J., appeals from the trial court's judgment terminating her parental rights to the child. In three related points of error, appellant contends the evidence was legally and factually insufficient to support the termination order. Specifically, appellant argues: (1) the child was not "endangered" under the terms of section 161.001(1)(D) or (E) of the Texas Family Code; and (2) termination was not in the child's best interest. See TEX. FAM.CODE ANN. § 161.001(1)-(2) (Vernon 2002). We reverse, in part, the decision of the trial court.
The record reflects that on November 4, 2003, the Texas Department of Family and Protective Services ("TDFPS"), received a referral alleging physical abuse of J.A.J., an eight-year-old boy.[1] The report indicated J.A.J. tied two shoe-strings together, told his older sister he was going to commit suicide, and then attempted to choke himself with the strings. His sister informed the children's grandmother who then told appellant. Appellant disclosed the incident to her husband, Don Perkins, who apparently became upset with J.A.J.'s suicide threats. Perkins allegedly ordered J.A.J. to put the strings back around his neck and then proceeded to grab the strings and choke J.A.J. The report further indicated J.A.J. had visible marks around his neck from the choking incident.
TDFPS sent a caseworker, Christine Powers, to investigate. Powers verified that J.A.J. had a dark, linear scab around his neck and questioned family members about the wound. J.A.J. gave his account of what occurred, and his sister confirmed the story by explaining she actually saw Perkins choke J.A.J.[2] In light of Perkins' conduct, TDFPS removed both children from appellant's home and placed them in an emergency temporary conservatorship with the agency. Immediately after removing the children from appellant's home, Powers observed a six-inch wide bruise across the back of J.A.J.'s left leg.[3] *624 Appellant admitted that she had spanked J.A.J. with a belt the previous day after he had attempted to "burn down the house." Appellant further admitted that the spanking had left marks and bruises on J.A.J.
Two months later, on January 7, 2004, TDFPS completed a Family Service Plan which required appellant to undergo a psychological evaluation and a drug/alcohol assessment, attend parenting and anger management classes at her expense, and attend an abuse prevention/intervention program as well as family and individual therapy paid for by TDFPS. The record suggests that, while appellant failed to fully comply with the plan, she made some effort to improve her situation and that of the children's home environment. Specifically, she submitted to a psychological evaluation and periodic drug testing. During this period, appellant tested positive for marijuana on one occasion. Appellant also failed to complete the required parenting classes, but she explained the absence from parenting classes was caused by inadequate funds and a lack of transportation. In addition, appellant requested placement in individual and family counseling, but was placed on a waiting list. She also visited the childrenalbeit sporadicallyand she separated from Perkins. Finally, appellant also succeeded in obtaining steady employment at Wal-Mart and was saving money to secure permanent housing.
On September 9, 2004, a bench trial was conducted in the 314th District Court. After considering the evidence and hearing relevant testimony, the court terminated appellant's parental rights to J.A.J. but made no ruling as to appellant's rights over her daughter.[4] On appeal, appellant challenges only the court's ruling as to J.A.J.

Standard of Review
Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985). In order to terminate parental rights, the State bears the burden to prove both: (1) the parent engaged in one of the grounds for termination listed in section 161.001(1) of the Texas Family Code; and (2) termination is in the child's best interest. TEX. FAM.CODE ANN. § 161.001; In re J.L., 163 S.W.3d 79, 84 (Tex.2005).
Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear and convincing evidence standard. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002); In re J.F.C., 96 S.W.3d 256, 265-66 (Tex.2002). This standard requires more proof than the preponderance of the evidence standard in civil cases, but less than the reasonable doubt standard in criminal cases. In re J.F.C., 96 S.W.3d at 265-66. "`Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002).
When reviewing the legal sufficiency of the evidence under this standard, we look at all the evidence in the light most favorable to the finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." In re J.F.C., 96 S.W.3d at 266. We must *625 assume the factfinder resolved disputed evidence in favor of its finding if a reasonable factfinder could do so. Id. A corollary to this requirement is that we must disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. Id. But because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. See id. ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence."); see also In re J.L., 163 S.W.3d at 88 (reversing and remanding to the appellate court for a determination of the factual sufficiency of evidence where it was unclear whether the court considered testimony involving disputed facts and opinions). If, after conducting our review, we determine that a reasonable factfinder could not form a firm belief or conviction that the allegations were true, then we must conclude the evidence is legally insufficient. In re J.F.C., 96 S.W.3d at 266.
When reviewing a factual sufficiency challenge, the analysis is slightly different because we must consider all the evidence equally, both disputed and undisputed. Id. The court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of the finding. Id. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. Id.

Dangerous Environment Under Section 161.001(1)(D)
In her first point of error, appellant contends the evidence was both legally and factually insufficient to support the court's finding that J.A.J. was endangered, either physically or emotionally, under Texas Family Code section 161.001(1)(D).[5] Subsection (D) permits a court to terminate parental rights when the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1)(D).[6] Under *626 this subsection, the inquiry focuses on dangerous surroundings or circumstances in which the parent knowingly places or allows her child to remain. See In re R.D., 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, no writ) (differentiating between subsections (D) and (E)); In re S.H.A., 728 S.W.2d 73, 84-85 (Tex.App.-Dallas 1987, writ ref'd n.r.e.) ("Subsection (D) . . . requires a showing that the child has been placed in an environment dangerous to the child's physical or emotional well-being.") (emphasis in original). "Thus, subsection (1)(D) refers only to the suitability of the child's living conditions." Williams v. Tex. Dep't of Human Sevcs., 788 S.W.2d 922, 926 (Tex.App.-Houston [1st Dist.] 1990), overruled on other grounds by In re J.N.R, 982 S.W.2d 137, 143 n. 5 (Tex.App.-Houston [1st Dist.] 1998, no pet.).[7]
Here, the State introduced no evidence regarding J.A.J.'s living environment, that is, the "conditions or surroundings" of the *627 child's home-life. In fact, the State asserts only two arguments on appeal to support the termination request under subsection (D). First, the State contends appellant is an uncaring mother who failed to complete even the most basic requirements of the TDFPS family service plan. Certainly, when a mother's parental rights are in jeopardy, her failure to complete the goals in the service plan may be considered in determining the best interest of the child. In re W.D.W., 173 S.W.3d 607, 613-14 (Tex.App.-Dallas, no pet.). However, the record shows appellant attempted to improve her situation after J.A.J. was taken into State custody. At the time of trial, she was living with her sister and had additional support from her mother, who testified she would help appellant. Appellant was also gainfully employed and testified she was saving money for a home of her own that she believed was obtainable within a few months. Undoubtedly, appellant should have complied with the remaining requirements of the TDFPS-ordered family service plan. Her failure to do so directly affected the decision of the trial court to terminate her parental rights.[8] Nevertheless, appellant's alleged poverty and lack of transportation, which she offered in explanation for her failure to comply with all of the family service plan, was not rebutted by the State. Further, despite her poverty, the record also reflects that appellant has consistently fought to maintain her parental rights, and there is reason in the record to believe she loves her son. While failure to meet conduct specified by an agreement with TDFPS is a factor worthy of consideration in a parental rights termination case, at least one court has held that it is not, by itself, sufficient to support such a termination. In re P.S., 766 S.W.2d at 840.
The second argument proffered by the State in support of termination is that appellant maintained an excessive and unreasonable disciplinary regimen that subjected J.A.J. to a dangerous environment. However, section 161.001(1)(D) of the Family Codes applies only to the acceptability of a child's living conditions or surroundings; it generally does not apply to the conduct of the parent toward the child. In re N.R., 101 S.W.3d 771, 775-76 (Tex.App.-Texarkana 2003, no pet.). Thus, subsection (D) refers only to the acceptability of the child's living conditions, such as where, for instance, the child is living in a house where there is no electricity, gas, or food. In the Interest of S.H.A., 728 S.W.2d at 84. Thus, under subsection (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct. Id. at 84-85.
We find the evidence legally insufficient to support the termination of appellant's parental rights under section 161.001(1)(D) of the Family Code. Accordingly, appellant's first point of error is sustained.

Conduct Under Section 161.001(1)(E)
In her second point of error, appellant contends the evidence is legally and factually insufficient to show she "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of [her son]," as required by section 161.001(1)(E) of the Family Code.
*628 Subsection (E) permits termination of parental rights where the parent has either: (1) personally engaged in conduct which endangers the child; or (2) knowingly placed the child with another person who engaged in dangerous conduct. TEX. FAM.CODE ANN. § 161.001(1)(E). Unlike subsection (D), the source of the danger must be the parent's conduct alone. In re D.P., 96 S.W.3d 333, 338 (Tex.App.-Amarillo 2001, no pet.); Doyle v. Tex. Dep't of Protective & Regulatory Sevcs., 16 S.W.3d 390, 395 (Tex.App.-El Paso 2000, pet. denied); In re S.H.A., 728 S.W.2d at 85. Thus, the relevant inquiry involves the parent's acts and omissions. See In re D.P., 96 S.W.3d at 338; Doyle, 16 S.W.3d at 395; In re S.H.A., 728 S.W.2d at 85.
More importantly, termination may not ordinarily be based on a single transaction, but rather "a showing of a course of conduct is required."[9]In re D.P., 96 S.W.3d at 338; see also In re D.T., 34 S.W.3d 625, 634 (Tex.App.-Fort Worth 2000, pet. denied) ("[A] voluntary, deliberate, and conscious `course of conduct' by the parent is required."). Particularly where the ground for termination involves the conduct of third parties rather than the direct conduct of the parent, knowledge that the third party is engaging in dangerous conduct is a required element. See In re U.P., 105 S.W.3d at 236 n. 7 ("[S]ubsection (E) requires only that the parent know others are engaging in endangering conduct.") (emphasis in original). In other words, a parent's rights should not be terminated absent proof she knew that placing her child with a third party endangered the child's well-being.
Placing J.A.J. in an environment that included Perkins might well have satisfied the "endangerment" requirements of subsection (E). Certainly, Perkins' choking of J.A.J. with a shoe string is a startlingly dangerous act. However, if Perkins had a known proclivity for abusing children, the State did not attempt to prove up this fact. To the contrary, nothing in the record suggests that Perkins had ever abused the boy before or given appellant any reason to believe that he might pose a threat to J.A.J. Moreover, as to the one incident of abuse, i.e., the choking of J.A.J. with a shoe string, the State offered no evidence regarding appellant's reaction to the abuse. Did she approve, encourage, and promote Perkins' abuse; or did she intervene, resist, and report the abuse? The record is silent in this regard.
The record establishes that some time after the incident, appellant and Perkins separated and remained separated at the time of trial. The State contends appellant wants to get back together with Perkins in the future. However, unless and until appellant and Perkins are reunited, the "threat" to J.A.J.'s physical or emotional well-being is purely theoretical. If Perkins rejoins the family, the State may file an appropriate action at that time. Under our present record, however, there is insufficient evidence that appellant knew Perkins was a threat to J.A.J. and yet permitted the harmful interaction to occur. Without more in the record, this singular incident is not enough to prove, by clear and convincing evidence, that appellant's parental rights should be terminated according to subsection (E). See generally In re D.J., 100 S.W.3d 658, 668-70 (Tex. App.-Dallas 2003, no pet.) (supporting termination of father's parental rights but finding insufficient evidence to support termination *629 of mother's rights under (D) or (E) despite father's criminal history, past drug use, and anger issues where no evidence provided mother with notice of present danger to child); In re D.P., 96 S.W.3d at 338-39 (holding evidence of a mother's actions or knowledge was insufficient to support trial court's termination order under subsections (D) or (E)); Williams, 788 S.W.2d at 927 (finding mother's two-month period of neglect when she was 17-years-old was insufficient to support termination).
Regarding appellant's conduct, the State alleges the evidence shows she had an admitted "pattern of hitting her child, though she could not recall how many times, and specifically in her admission that she inflicted bruises on her child's leg and back that were visible in pictures taken of the child." The record reflects, however, that no photographs were offered or received in evidence. Moreover, while appellant admitted that she spanked J.A.J. with a belt after "he had tried to burn down the house," she could not recall how many times she had spanked him. Although she conceded that bruises were visible on his back and leg the day following the spanking, she said she spanked the boy only infrequently. However, she admitted that when she used a belt to spank the boy, she would sometimes leave "marks." This is the full extent of the evidence regarding appellant's "endangerment" of the child. Thus, the issue before us is whether infrequent spankings of a child that leave "marks" or visible bruises 24 hours after the spanking constitute sufficient evidence to show that a parent has endangered the child's physical or emotional well-being to such a degree as to warrant termination of the actor's parental rights.
The propriety of corporal punishment is an increasingly controversial subject. Not many years ago, "children were disciplined in homes and at school by spanking them with rulers, sticks, and belts, and this type of discipline was not looked upon as child abuse. Rather, it was considered an acceptable form of discipline." In re B.B., 598 N.W.2d 312, 317 (Iowa App.1999) (Sackett, C.J., concurring). This traditional method of discipline, however, may be declining.
For example, in 1962, fifty-nine percent of parents used spanking as the "main disciplinary method," whereas by 1993, that figure had dropped to nineteen percent, with thirty-eight percent of parents preferring time-outs and twenty-eight percent favoring lecturing. In 1968, ninety-four percent of U.S. adults agreed with the statement that it is "sometimes necessary to discipline a child with a good hard spanking," yet by 1992, "only sixty-six percent agreed with this statement."
Deana Pollard, Banning Child Corporal Punishment, 77 TUL. L.REV. 575, 582 (2003).
But while many critics of corporal punishment contend the practice violates "children's rights" grounded in "their autonomy, dependence . . . capacity for development . . . [and] essential humanity,"[10] it is still widely employed in this country. At least 90 percent of American parents have used corporal punishment at some time in rearing their children.[11] So prevalent is the practice that one sociologist has observed, "Were we speaking statistically, we would surely describe those parents who do not spank their children *630 as deviants."[12] A 1992 Ohio study showed that 70 percent of 800 family physicians and 59 percent of 400 pediatricians supported spanking.[13] Moreover, "[r]ecent research on parenting styles has found . . . that `authoritative' styles, characterized by strict discipline, high demands for obedience, and high levels of warmth, tend to produce better-adjusted children than non-authoritative styles."[14] Finally, to the degree that corporal punishment is declining, at least one sociologist has suggested there may well be a direct correlation between the declining use of corporal punishment and rising juvenile violence.[15]
Nevertheless, courts have, with increasing frequency, concluded that spanking with a belt constitutes child abuse and may be considered as a factor in terminating a person's parental rights. See In re Adrian H, No. A102631, 2003 WL 23100264, *3 (Cal.App. 1 Dist. Dec.31, 2003) (holding that "hitting a child with a belt goes beyond spanking and is not an appropriate form of discipline . . . hitting with a belt and a switch crossed the line over into abuse"); In re T.M.K., 172 N.C.App. 170, 616 S.E.2d 31, No. COA04-1019, 2005 WL 1804792, at *1 (N.C.App. Aug.2, 2005) (holding that spanking with a belt in a manner that leaves marks was a factor in the termination of parental rights); In re T.A., 663 N.W.2d 225, 236 (2003) (the state successfully alleged as an act of abuse a spanking with a belt that left a bruise on one hip); Matter of J.A.H., 502 N.W.2d 120, 123-24 (S.D.1993) (holding one basis for terminations was physical abuse consisting of spanking with belts or other instruments).
However, it is "not a court's function to determine whether `parents measure up to an ideal, but to determine whether the child's welfare has been compromised.'" In Interest of J.P., 294 Ill.App.3d 991, 1005, 229 Ill.Dec. 565, 573, 692 N.E.2d 338, 346 (Ill.App. [1st Dist.] 1998) (quoting In re F.W., 261 Ill.App.3d 894, 902, 199 Ill. Dec. 769, 634 N.E.2d 1123 (1994)). "We must take care not to create a legal standard from our personal notions of how best to discipline a child." Id.
The State interprets the appellant's testimony to imply she hit J.A.J. to the point it left marks any time she had problems with the child. However, contrary to the State's interpretation, appellant unequivocally stated the spankings were "not regular" occurrences. She also explained that she never hurt the child other than the "infrequent" spankings. The record contains no photographs of the bruise seen on J.A.J.'s body when he was taken into State custody.[16] Moreover, there is no evidence of previous bruises.[17] While the *631 testimony offered by the State constitutes some evidence that appellant may have used excessive force, we are not free to make assumptions or inferences not wholly supported by the record, particularly in cases involving such fundamental constitutional rights as parental rights. See generally Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (characterizing parental rights as "essential," a "basic civil right," and "far more precious . . . than property rights"); Holick, 685 S.W.2d at 20-21 ("[T]ermination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent."). Thus, despite the State's assertion that appellant's disciplinary regimen was frequently excessive, there is no evidence before us of any previous abuse or prior complaints. In fact, the TDFPS caseworker initially assigned to investigate the family provided an affidavit explaining "the family has no history of CPS referrals." Further, the caseworker overseeing the children's foster care conceded at trial that but for the allegations against Perkins, J.A.J. would not have been taken from appellant and placed in foster care.[18] Accordingly, the State's contention that appellant regularly and excessively hit J.A.J. is not supported by the record.
Utilizing the standards heretofore articulated, we find the evidence both legally and factually insufficient to support a termination of parental rights under section 161.001(1)(E) of the Family Code. Accordingly, appellant's second point of error is also sustained.

Best Interest of the Child
In her third point of error, appellant contends the evidence is legally and factually insufficient to support the trial court's finding that the termination of her parental rights was in the best interest of the J.A.J. The record reflects that all parties agree that J.A.J. should remain in contact with his sister to the fullest extent possible. She appears to be the one person with whom J.A.J. has a very close relationship. There is a substantial concern that terminating appellant's parental rights over J.A.J. but not his sister will have a detrimental impact on J.A.J. Furthermore, the attorney ad litem appointed to represent J.A.J.'s interests at trial said he believed appellant's parental rights over J.A.J. should not be terminated. However, having found the evidence legally insufficient under section 161.001(1)(D) and (1)(E), we need not decide whether the evidence is also legally and factually insufficient to support the trial court's conclusion that termination was in the J.A.J.'s best interest.
Accordingly, we reverse that portion of the trial court's decree terminating appellant's parental rights as to J.A.J. and appointing the Department of Family Protective *632 Services as the sole managing conservator of the child, and render judgment denying the Department's request to terminate appellant's rights as to J.A.J. In all other respects, the judgment of the trial court is affirmed.
MIRABAL, Senior Justice, concurring and dissenting.
MIRABEL, Senior Justice, concurring and dissenting.
I respectfully concur in part, and dissent in part.
In my opinion, the proper remedy would be to reverse the judgment as to both the mother and the unknown father, and to remand to the trial court for further proceedings consistent with our opinion.
It appears that the only reason the unknown father was made a party to this suit was to facilitate an adoption of the child in the event the mother's parental rights would be terminated. The "Decree for Termination" states that the identity and location of J.A.J.'s father are unknown, and that he "received process in this cause by substituted service but did not otherwise answer or appear." Of course, the unknown father did not appeal the termination of his parental rights.
In my opinion, we should follow the reasoning of the Court in Swinney v. Mosher, 830 S.W.2d 187, 197 (Tex. App.___ Fort Worth 1992, writ denied):
[T]he subject child's natural father [] did not appeal the judgment terminating his parental rights. As a general rule, when one party appeals from a judgment, a reversal on her behalf will not justify a reversal as to other nonappealing parties. This rule does not, however, apply where the respective rights of the appealing and nonappealing parties are so interwoven and dependent on each other as to require a reversal of the entire judgment. Turner, Collie & Braden v. Brookhollow, Inc., 642 S.W.2d 160, 166 (Tex. 1982). In such a case, the court must reverse the entire judgment in order to provide the appellant with the full and effective relief. Id.

[The natural father's] termination was done to facilitate [the child's] adoption by the [proposed adoptive parents]. because we find that . . . there was no evidence or alternatively insufficient evidence for involuntary termination [of the natural mother's parental rights], the adoption . . . will not proceed. Thus, [the natural father's] termination is neither necessary nor desirable. And further, his termination would prejudice the rights of [the child and mother] to receive support. [The mother's and father's] parental rights in reference to [the child] and [the child's] best interests are so interwoven and dependent on each other as to require a reversal of the entire judgment. In order to provide full and effective relief and for the best interest of the child, we reverse the trial court's judgment terminating [the nonappealing father's] parental rights.[1]
In the present case, I would reverse the judgment terminating the parental rights of appellant and the unknown father as to J.A.J., and I would remand the case to the trial court.
KEM THOMPSON FROST, Justice, dissenting opinion on denial of motion for enbanc rehearing.
En banc review of this case is necessary to secure and maintain the uniformity of *633 this court's decisions. See TEX R.App. P. 41.2. An intermediate court of appeals is a unitary body, even if, as is true of the Fourteenth Court of Appeals, the court normally sits in three-justice panels that do not include all of the court's justices. See O'Connor v. First Court of Appeals, 837 S.W.2d 94, 96 (Tex.1992) (orig. proceeding). The decision of any such three-member panel constitutes the decision of the whole court of appeals. See id. If one panel of this court reaches a holding that is contrary to the holding of a prior panel, then this court has spoken inconsistently. See id. To remedy this undesirable and problematic situation, the appellate rules provide for en banc review to secure or maintain the uniformity of an intermediate appellate court's decisions. See id.
Texas Rule of Appellate Procedure 41.2 governs the decision to grant a motion for rehearing by the en banc court:
En banc consideration of a case is not favored and should not be ordered unless necessary to secure or maintain uniformity of the court's decisions or unless extraordinary circumstances require en banc consideration.
TEX.R.App. P. 41.2(c). The Department of Family and Protective Services asserts in its motion for en banc rehearing that en banc review is necessary in this case to secure or maintain the uniformity of this court's decisions because the panel's opinion is contrary to other identified decisions in which this court has ruled the opposite way on one of the issues in the case.
In J.R. I, this court held that the evidence at trial was legally insufficient to support termination of the mother's parental rights and, on this basis, reversed the trial court's judgment. See In re J.R., 171 S.W.3d 558, 579 (Tex.App.-Houston [14th Dist.] 2005, no pet.). Although this court reversed as to termination of the mother's parental rights, this court did not reverse the part of the trial court's judgment appointing the Department as sole managing conservator of the mother's children. See id. This court stated that it did not reverse this conservatorship determination because the mother had not challenged this part of the trial court's judgment on appeal. See id.
Slightly more than a year later, this court issued the panel opinion in the case at hand. See In re J.A.J., No. 14-04-01031-CV, 2006 WL 2291175, 225 S.W.3d 621, (Tex.App.-Houston [14th Dist.] Aug. 10, 2006, no pet. h.). Coincidentally, this case involves an appeal from the same district court as in J.R. I, and though the parent is different, the attorneys representing the appellant mother and the appellee Department are also the same. See In re J.A.J., 2006 WL 2291175, at *1; In re J.R., 171 S.W.3d at 558. As in J.R. I, this court determined that there was legally insufficient evidence to support the termination of the mother's parental rights. See In re J.A.J., 2006 WL 2291175, at *7; In re J.R., 171 S.W.3d at 579. As in J.R. I, the mother did not challenge on appeal the part of the trial court's judgment appointing the Department as sole managing conservator of the mother's children. See In re J.A.J., 2006 WL 2291175, at *1; In re J.R., 171 S.W.3d at 579. However, despite this failure to assign error as to the trial court's conservatorship determination, in J.A.J., this court reversed the part of the trial court's judgment appointing the Department as sole managing conservator of the mother's child. See In re J.A.J., 2006 WL 2291175, at *8. In a context indistinguishable from that in J.R. I, this court has reached a holding that is the exact opposite of this court's holding in J.R.I. See In re J.A.J., 2006 WL 2291175, at *8; In re J.R., 171 S.W.3d at 579.
In the same context, the Second Court of Appeals has reached the same holding *634 as this court's holding in J.R.I. See In re E.A.W.S., No. 2-06-00031-CV, 2006 WL 3525367, at *18 & n. 55 (Tex.App.-Fort Worth Dec. 7, 2006, pet. denied) (mem.op.). With one justice dissenting, the First Court of Appeals recently reached the same holding as this court's holding in J.A.J. See Colbert v. Dep't of Family & Prot. Servs., Nos. 01-04-01232-CV, 01-04-01233-CV, 01-05-00124-CV, 01-05-00126-CV, 01-05-00127-CV, 2006 WL 3752371, at *15-16, ___ S.W.3d ___, ___ (Tex.App.-Houston [1st Dist.] Dec. 21, 2006, no pet. h.); Colbert, 2006 WL 3752371, at *16-17 (Jennings, J., concurring and dissenting). A motion for en banc consideration is currently pending before the First Court of Appeals in that case. Furthermore, in an appeal following remand in J.R. I, this court has recently restated its agreement with its holding in J.R. I and noted its disagreement with the First Court of Appeals's holding in Colbert. See In re J.R., 222 S.W.3d 817, 819 (Tex.App.-Houston [14th Dist.] 2007, no pet. h.). Clearly, the issue is a recurring one. Moreover, the issue concerns a matter of the utmost importancethe conservatorship of children.
One might disagree with this court's holding in J.R. I or one might disagree with this court's holding in J.A.J., but it is difficult to disagree with the conclusion that there is a conflict between these two holdings and therefore a lack of uniformity in this court's decisions.
Though en banc consideration of a case is not favored, it is appropriate and necessary in this case not only to resolve the undeniable conflict so that this court may speak with one voice on this important issue, but also because the issue is likely to recur frequently. The court's failure to resolve the issue now will only prolong the confusion and uncertainty.
For all of these reasons, this court should grant en banc review. Because it does not, I respectfully dissent from this court's denial of the Department's motion for en banc rehearing.
(Chief Justice HEDGES and Justices YATES, ANDERSON, HUDSON, and MIRABAL[1] vote to deny the motion; Justices FOWLER, EDELMAN, SEYMORE, and GUZMAN join this dissenting opinion).
NOTES
[1] At the time of the alleged abuse involved in this case, the state agency charged with preventing delinquency, abuse, neglect, and exploitation of Texas children and elderly or disabled adults was known as the Texas Department of Protective and Regulatory Services ("TDPRS"). The agency's name has since been changed to TDFPS and, therefore, we will refer to the agency only by its current name.
[2] In addition, J.A.J.'s sister said the children's grandmother fabricated a story about how the marks appeared on J.A.J.'s neck and told the children to "stick to the story." However, appellant herself admitted witnessing Perkins pull on the strings once they were around J.A.J.'s neck. Thus, there is little dispute that the incident occurred.
[3] In an affidavit attached to its original petition for termination, Powers stated that both J.A.J. and his sister reported that the bruise was sustained when J.A.J. was paddled with a board. Although both children claimed appellant and Perkins had paddled J.A.J. with a "board," appellant testified that she only used a belt to spank J.A.J. In any event, neither the TDFPS employee, J.A.J., nor his sister testified at trial, and no evidence was introduced to indicate that J.A.J. was ever struck with a board.
[4] Because a prior case was filed affecting the sister's relationship with her father, the 314th District Court severed and transferred her case to the court with continuing jurisdiction, the 308th District Court.
[5] The trial court found appellant engaged in conduct under both subsections (D) and (E). However, a finding under any one subsection listed in 161.001(1) can be sufficient grounds for termination. See generally In re A.V., 113 S.W.3d 355, 362 (Tex.2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."); In re U.P., 105 S.W.3d at 236 ("[A]ppellant's parental rights can be terminated with a finding of best interest of the child and any one of the . . . § 161.001(1) grounds challenged by appellant."); In re W.J.H., 111 S.W.3d 707, 715 (Tex.App.-Fort Worth 2004, pet. denied) ("If multiple conduct grounds are alleged for termination, the evidence is factually sufficient if it factually supports just one of the alleged conduct grounds."). Therefore, because appellant challenges both findings, on appeal we must address both subsections to determine whether there was sufficient evidence to support the trial court's termination order. See In re A.V., 113 S.W.3d at 362; In re U.P., 105 S.W.3d at 236; In re W.J.H., 111 S.W.3d at 715.
[6] "Endanger" under section 161.001(1) means to "expos[e] to loss or injury; to jeopardize." In re M.C., 917 S.W.2d 268, 269 (Tex.1996) (quoting Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987)). "Although `endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." Id.; see also In re U.P., 105 S.W.3d at 233 (detailing the range of actions considered "endangerment"); In re J.I.T.P., 99 S.W.3d 841, 844 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (similarly defining endangerment).
[7] We recognize a number of courts have applied subsections (D) and (E) together and have extended the "conduct" requirement to subsection (D). See, e.g., In re R.D., 955 S.W.2d at 367 (observing that termination under both subsections (D) and (e) res on parental conduct); In re W.S., 899 S.W.2d 772, 776 (Tex.App.-Fort Worth 1995, no writ) (considering both the physical environment as well as the parents' conduct to support termination under subsection (D)); In re B.R., 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied) (holding that abusive or violent conduct by a parent or other resident of a child's home can produce an environment which endangers a child's physical or emotional well-being); Smith v. Sims, 801 S.W.2d 247, 251 (Tex.App.-Houston [14th Dist.] 1990, no writ) (concluding the conduct of a parent is relevant in determining whether a dangerous environment exists as required for termination under subsection (D)). We agree that the conduct of parents or others in the home, generally, can produce dangerous surroundings or circumstances sufficient to support termination under subsection (D). For example, if there is a history or pattern of abuse over time, this can create a home environment which threatens the child's physical or emotional maturation and risks future emotional problems. See generally In re N.R., 101 S.W.3d 771, 776-77 (Tex.App.-Texarkana 2003, no pet.) (noting father's propensity for extensive physical abuse towards children and others); In re T.T., 39 S.W.3d 355, 362-63 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (finding sufficient evidence for termination where mother knew her husband abused oldest child even before youngest child was born). We also agree that knowingly placing a child in a specific, dangerous situation can support termination under subsection (D). See Smith, 801 S.W.2d at 251 (Tex.App.-Houston [14th Dist.] 1990, no writ) (finding a father's conduct created a dangerous environment where, in the presence of his children, he took hostages and forced a confrontation with a Houston Police Department SWAT team).

However, absent a notable history of abuse or a specific instance which clearly endangers a child, we should be careful to maintain the critical distinction between "conditions or surroundings" required under subsection (D) and "conduct" required under subsection (E). See generally Williams, 788 S.W.2d at 926 (explaining that different proof is required under subsections (D) and (E)); In re S.H.A., 728 S.W.2d at 85 ("We perceive the distinction between subsections (D) and (E) to be the cause of the resulting danger to the child's physical or emotional well-being. Under subsection (D), it must be the environment which causes the child's physical or emotional well-being to be endangered.") (emphasis in original).
After reviewing the statutory language and relevant case law, we believe the more logical interpretation of section 161.001(1)(D) suggests "[e]vidence regarding a parent's conduct is relevant only to the issue of whether the parent `knowingly' placed or allowed the child to remain in [dangerous] `conditions or surroundings.'" In re P.S., 766 S.W.2d 833, 835 (Tex.App.-Houston [1st Dist.] 1989, no writ). Accordingly, we will limit our analysis under subsection (D) to the evidence pertinent to the dangerous conditions or surroundings to which J.A.J. was exposed.
[8] Just before pronouncing the court's termination order, the trial judge stated "I think [appellant] certainly could have done more in terms of visiting, in terms of following through on the parenting classes. I'm disappointed she had one positive drug U.A. I'm certainly not commending her on her performance. I really did think they were inadequate. The ultimate sanction is termination . . ."
[9] Certainly, it is possible in a case of extreme abuse for termination to be warranted by conduct arising out of a single incident. See, e.g., Smith v. Sims, 801 S.W.2d 247, 250 (Tex. App.-Houston [14th Dist.] 1990, no writ) (holding termination was warranted where father held the child hostage after murdering her mother).
[10] Tamar Ezer, A Positive Right to Protection for Children, 7 Yale Hum. Rts. & Dev. L.J. 1, 37 (2004)
[11] Pollard, at 577.
[12] Steven L. Nock, Violence in the Family: Is Spanking Universal?, 8 VA J. SOC. POL'Y & L. 61, 62 (2000).
[13] Pollard, at 581-82.
[14] Nock, at 68.
[15] Id. at 62.
[16] The record indicates photographs were taken and were shown to appellant at some time prior to trial. However, these photographs were not introduced into evidence or otherwise published to the court, and the pictures are not contained in the appellate record.
[17] For example, the State points out appellant admitted leaving marks on J.A.J. "at times." This could mean, as the State postulates, that appellant often left bruises on J.A.J. However, the record does not indicate the frequency or severity of these "marks." Thus, it is also possible the marks were nothing more than temporary welts or red marks typical of many spankings.

Regarding the spanking that left a visible bruise, appellant explained the spanking was in response to J.A.J.'s attempt to burn down their house. Moreover, we are not prepared to hold that a bruise on the buttocks or the back of the legs is, by itself, proof of unreasonable or excessive force. See generally TEX. FAM.CODE ANN. § 261.001(1) (Vernon 2002) (setting forth the Family Code definition of child abuse).
[18] Again we note, as far as Perkins is concerned, there is no history or pattern of abuse suggesting J.A.J. was exposed to a dangerous environment by living with his stepfather. Some evidence exists to suggest J.A.J. is scared of Perkins. However, we find no authority to support the proposition that general fear of one's parents, without more, creates an unhealthy or dangerous environment. The choking incident could be construed as an act that placed J.A.J. in a dangerous circumstance. However, this singular act is not enough to find appellant knowingly placed or allowed J.A.J. to remain in a dangerous environment. For more analysis of Perkins' involvement, see discussion infra "Conduct Under Section 161.001(1)(E)."
[1] I note that, even though the identity and location of J.A.J.'s father is currently unknown, that does not mean his identity and location will always be unknown. There is no good reason to terminate his parental rights at this time, and such an action could prejudice J.A.J.'s rights if his father is identified in the future.
[1] Senior Justice Margaret G. Mirabal sitting by assignment.