

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00089-CV

IN THE INTEREST OF T.S., B.S.,
B.S., AND T.S., CHILDREN

-----------

FROM THE 325TH DISTRICT COURT OF TARRANT COUNTY

-----------

## MEMORANDUM OPINION[1]

-----------

## I. Introduction

Appellants T.O. (Mother) and B.S. Sr. (Father) appeal the termination of their parental rights to their children, T.S., B.S., B.S. Jr., and T.S. The trial court found by clear and convincing evidence that Appellants had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that

---

[1]*See* Tex. R. App. P. 47.4.

endangered their physical or emotional well-being, and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (Vernon Supp. 2010). The trial court also found that termination of the parent-child relationship would be in the children's best interest. *See id*. § 161.001(2).

In two points, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings. In three points, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings and argues that it was an abuse of discretion for the judge of the 324th District Court to hear the case while the 325th District Court continued to have jurisdiction. Because we hold that the 324th District Court did not abuse its discretion by hearing the case while the 325th District Court continued to have jurisdiction, we overrule that issue. Further, because we hold that the evidence is legally and factually sufficient to support the endangerment findings against both Mother and Father, we affirm the trial court's judgment as to the termination of their parental rights.

II. Factual and Procedural Background

**A. DFPS's Investigation**

Mother and Father have been in an off-and-on relationship for over eleven years, at times living in separate residences. They have four children together,

2

T.S., born February 3, 2004, B.S. and B.S. Jr., born February 10, 2007, and T.S., born June 20, 2008. This family was first referred to the Texas Department of Family and Protective Services (DFPS) in February 2007, when Mother showed up for a medical appointment with a scratch on her face. Mother admitted that she had received the scratch during an altercation with her mother while Mother was eight months pregnant with the twins. The twins were born the next day, one month premature. There is also evidence that Father had assaulted Mother while she was pregnant with the twins. Father pleaded guilty to assaulting Mother by "striking or dragging her with his hand."

DFPS was contacted again in July 2007, after Mother assaulted another woman at the children's daycare. During the altercation, Mother bit the other woman in the abdominal area, obtained an object to use as a weapon, and caused property damage to the daycare by removing a sink. A staff member at the daycare was injured when she tried to stop Mother from attacking the other woman. The DFPS investigator ruled that there was reason to believe neglectful supervision by Mother. A daycare employee testified that the children would sometimes come to the daycare dirty and smelling so bad that the daycare staff would have to bathe them. Because the parents' case was still ongoing, the investigator took no action other than offering resources. DFPS offered parenting classes, therapy, anger management, and referrals for assistance with

3

food stamps and Temporary Assistance for Needy Families (TANF). Mother and Father did not participate in these offered services.

When T.S. was born in June 2008, the hospital notified DFPS that Mother was "exhausted and overwhelmed and possibly unable to care for her 3 children that reside at home." The investigator discovered that Mother was selling her food stamps and living illegally with her mother, who was in Section 8 housing. The investigator found that there was reason to believe physical neglect by Mother. Despite concerns that Mother was once again living with her mother—a person with whom she had a history of physical violence—DFPS continued to allow the children to remain with Mother. The case was designated "Intensive" and assigned to Family Preservation Services.

In September 2008, believing that the family was at high risk for removal of the children, DFPS interviewed Mother and Father to assess their qualifications for Family Based Safety Services. This program offered financial assistance to the parents. Mother seemed willing to discuss her need for a monthly stipend for rent, diapers, and other items, as well as her need for money for furniture. At this point, she had moved and the DFPS worker found her and the four children living in a house with no furniture other than a king-sized bed. Approximately a week later, Mother was arrested and jailed.

4

Mother's incarceration was the result of another violent incident with her mother. The children had been playing outside when Mother and her mother got into a fight. When the children entered the house, Mother picked up one of them in an attempt to get her mother to stop hitting her. Mother testified she did not fight back because she did not want the children seeing her hit their grandmother. Nonetheless, Mother bit her mother. Mother was then arrested.

While Mother was in jail, Father was the sole caregiver of all four children. DFPS found Father in a sparse apartment with no diapers for the children. Father had tied shirts around the twins' waists to serve as diapers, but the shirts were full of waste, and Father had nothing for them to change in to. Father did not have a job and, therefore, had no financial ability to buy necessities for the children. DFPS provided food, formula, and clothing to Father for the children. Even after the clothing was furnished to Father, the DFPS worker found the children dressed only in diapers or t-shirts and diapers at her visits.

The DFPS investigator also witnessed Father "propping" the infant's bottle up while she drank, which is dangerous and could lead to choking. The investigator instructed Father not to prop the bottle. When she returned the next day, Father was still propping the bottle. He admitted that he knew it was dangerous but he "didn't know what else to do." The worker also returned to the house in October 2008 to find the bottle propped in the mouth of T.S. while under the care of Father.

The investigator saw that Father was overwhelmed caring for four small children by himself, but she testified that she did not see any "red flags" indicating she should remove the children from his care. The children appeared to be happy and to love their father. DFPS noted that Father "really wanted the help. He wanted to be able to provide for the children. He tried very hard. He was just very overwhelmed with having four children. He really wanted them, really wanted to do what was right for them." DFPS recommended parenting skills classes. Father had a Women, Infants, and Children Food Assistance Program (WIC) card but, because he was not listed as a person who could use it, he was unable to purchase items with it. Father did not have an ID to get on the WIC account or to get food stamps, and he had failed to obtain an ID card. Father also did not go to the daycare to complete the necessary paperwork to enroll the children.

Father was arrested in October 2008 and charged with robbery and aggravated robbery. Before his arrest, Father had informed the DFPS investigator that he believed he had a warrant for his arrest for failure to report for his probation appointment and for engaging in additional criminal activity. After he was arrested, he used his allotted phone call to call the investigator to retrieve the children. All four children were sent to a foster family, with whom they still reside. DFPS sent a letter to Father while he was incarcerated outlining the

requirements of his service plan. Father claims to have never received it, and DFPS could not verify its receipt.

When Mother was released from jail, DFPS gave her a service plan, which required various classes and therapies. Mother completed the classes in parenting, domestic violence, and anger management, and she consented to a psychological evaluation. Mother said she learned a lot, but at trial she could not recall anything specific that she learned. As a result of her apparent progress, the trial court granted Mother temporary possessory conservatorship as recommended by DFPS. The children were to be returned to her based in part on her representation that she held a job. Mother told DFPS that she could not take the children full time because she was working at USA Janitorial Services during the week. In fact, she was not working there at the time, and it is unclear if she ever did work there or for how long. Instead, the evidence showed that Mother had been posing for risqué pictures that were supposed to appear in a magazine but were also posted on a website. Mother even acknowledged that she had misled the trial court at the hearing to get her children back by stating that she was working at USA Janitorial Services when she was not. Based on Mother's representations, DFPS was going to provide daycare for the children, but until that was arranged, she would get weekend visits, and the children would spend the week with their foster family. When DFPS found out that Mother was not employed at USA Janitorial Services, they informed her that she would be

7

getting the children full time. Mother also admitted that she told the food stamps office that she was unemployed while she was working so she could get food stamps. She applied for food stamps on an emergency basis the first weekend she had the children although she acknowledged that she had food that had been sent by the foster family. When DFPS told her that she could still get food stamps even if she was employed, she responded that "she never tells them she's working. She's always told them that she didn't have employment."

DFPS also agreed to a list of approved caretakers to assist Mother in watching the children, including Mother's sister. Despite the fact that the children's maternal grandmother was not on the list and was an alcoholic, Mother repeatedly left the children with their grandmother. Mother told DFPS she thought it was okay to leave the children with her mother as long as another person was also present.

At the final weekend visit, DFPS claimed that Mother "didn't appear excited" about getting her children for the weekend. Mother asked the DFPS worker if it would be all right if she would not be at home on Monday morning when DFPS came to retrieve the children and if instead, her sister would be watching them. DFPS approved. That Monday, Mother was not at home when DFPS arrived, but neither was her sister. The children were with a woman named "Red," whom the oldest child told DFPS had watched them that weekend. "Red" was a friend of Mother's who also had posed for pictures that had

8

appeared on the same website as the pictures of Mother. The sister entered the apartment soon after DFPS's arrival.

The next day, a man who identified himself as Mother's employer called DFPS and told them he had hired Mother that weekend and had flown her to California to work for his company, which produces pornographic films. He told DFPS that Mother would be required to fly to California every other week for training in video editing, and that other travel in Texas, Oklahoma, and Louisiana would be required. Mother claimed that after watching a video shoot, she decided not to return to California because she "[d]idn't want to be in any trouble."

DFPS changed their plan for this family to termination and filed a motion to modify possessory conservatorship in an emergency after learning of Mother's absence on her weekend visit and the reason for her absence. According to the children's service plans, the twins, B.S. and B.S. Jr., were developmentally delayed and had asthma. At one year of age, they were unable to talk or chew food. B.S. was diagnosed as failure to thrive. The infant, T.S., was described as being "stiff when held." However, the children have adjusted well to their foster family. DFPS's plan is for them to be adopted permanently by their foster family.

**B. Criminal History**

Mother was charged with two crimes as a result of the assault at the daycare. She pleaded guilty on September 21, 2007, to criminal mischief and

assault with bodily injury and received deferred adjudication probation. On September 6, 2008, Mother again committed an assault and on October 7, 2008, was convicted of that offense upon a plea of guilty. Her guilt was adjudicated and her probation was revoked in her previous cases. Her admitted repeated misrepresentations to obtain food stamps also suggests criminal conduct.

Father's criminal record was, in large part, proved up by criminal records admitted at trial. At the time of trial, Father was incarcerated and awaiting trial for multiple alleged offenses. Father had been placed on four years' probation in October 2001 for robbery by threats, and the probation had been revoked on August 5, 2003. Father committed burglary of a vehicle on May 20, 2003, and was convicted for that offense on August 7, 2003. These convictions form the basis of the pending enhancement to the indictments against him at the time of trial.

Mother testified that Father assaulted her when she was approximately four months pregnant with the twins. He was convicted of that assault in November 2006. Mother also testified that soon before the twins were born, Father was in jail in Corsicana for possessing marihuana. Father also tested positive for marihuana on the first drug test administered by DFPS in July 2007. At the time of trial, Father was under indictment for aggravated robbery with a firearm and robbery, both charges with enhancement paragraphs, and he was

10

also charged with misdemeanor theft. Father had been in jail for sixteen months when this case was tried on February 25, 2010.

## III. Legal and Factual Sufficiency

### A. Standards of Review

Both Mother and Father complain that the evidence presented at trial is legally and factually insufficient to support the court's termination of their parental rights under section 161.001 of the Family Code. A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*,

11

685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this case, the State alleged proof under subsections (D) and (E) of section 161.001 of the family code. Those sections state that the court may order termination of the parent-child relationship if the court finds that the parent has either "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001 (D), (E).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see* 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.*

12

§ 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness-credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the

appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parents violated subsection (D) or (E) of section 161.001(1). Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). To prove endangerment under subsection (D), DFPS had to prove that the parents (1) knowingly (2) placed or allowed the children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). Subsection (D) focuses on dangerous conditions or surroundings that endanger the physical or emotional well-being of the children. *In re J.A.J.*, 225 S.W.3d 621, 625 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh'g), *judgm't aff'd in part, rev'd in part by* 243

S.W.3d 611 (Tex. 2007). It focuses on the suitability of the children's living conditions. *Id*. Thus, under (D), it must be the environment itself that causes the children's physical or emotional well-being to be endangered, not the parent's conduct. *Id*.

Under (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parents' conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parents' conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

> [A] child's exposure to continually unsanitary living conditions, his continued uncleanliness, his medical needs and lack of attention thereto, and his subjection to physically abusive parents are indicia

15

which may prove endangerment. He need not develop or succumb to a malady due to those conditions before it can be said that endangerment arises.

*In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.).

## B. Sufficient Evidence Supports Termination Under Sections 161.001(D) and (E)

We hold there is legally and factually sufficient evidence that both parents knowingly placed the children in physically or emotionally dangerous conditions and that their conduct endangered the children's physical well-being. Since the evidence pertaining to subsections 161.001(D) and (E) is so interrelated, we will consolidate our review.

DFPS has been referred three times. Twice they have ruled that there is reason to believe that Mother was neglecting the children. Mother has a history of abusive and assaultive behavior that the children witnessed or were made a part of. She continually placed the children in the environment where the violence took place.

Mother has not provided stable and sufficient housing for the children and did not demonstrate a concrete plan to do so in the future. She did not put her children first by initially working her services and only became cooperative when she was offered financial assistance. Although Mother finally participated in her services when she was released from jail, the evidence was sufficient for the trial court to conclude that her conduct had, in fact, not improved and would continue

16

to endanger her children. The evidence showed that immediately before the children were returned to the Mother for the weekends, she posed for partially nude pictures along with her friend "Red." Mother lied to the DFPS worker and was not honest in court as to where she was working when the children were being returned to her. She testified that she was not honest in her answers concerning employment when attempting to obtain food stamps at that same time. Even after working services, Mother allowed the children to be supervised by "Red" and other unapproved caregivers. She was not honest with the worker when the children were delivered on their last weekend visit as she knew she would not be at home with her children for their weekend visit. Instead of staying with her children, Mother chose to go to California to earn some quick money editing pornographic films.

Father has a history of violent criminal conduct and substance abuse. During the time that he was solely responsible for the four children, Father showed that he was incapable of providing conditions that did not endanger their physical or emotional well-being and that this environment did, in fact, create a potential for danger which he was aware of but disregarded. *See In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Father had also failed to provide stable housing for the children. His future at the time of trial was, at best, uncertain. Father admitted that if the children were released to him on the day of trial, he would not be able to provide housing for them. Father

17

initially refused services offered by DFPS.  Although he was financially unable to care for his children, he did not get the identification needed to obtain food stamps and WIC.  He also failed to complete the paperwork to enroll his children in daycare.  He did not explain why he did not follow through with the actions necessary to obtain the benefits for his children.  Father allowed the children to remain in homemade diapers full of waste.  Even when provided clothing, he did not adequately dress them.  Even when warned of the dangers of "propping" an infant's bottle up while she drank, he continued to endanger the child by feeding her in that fashion.

Each parent repeatedly committed criminal acts that subjected them to the possibility of incarceration.  While imprisonment alone is not a basis to terminate parental rights, it is an appropriate factor to consider.  *See In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.).  Each time these parents were jailed, they were absent from their children's lives and unable to provide a home or support, which negatively impacted the children's living environment and emotional well-being.  *Id.,* s*ee In re C.L.C.,* 119 S.W.3d 382, 393 (Tex. App.—Tyler 2003, no pet.) (holding that it is sufficient that the parent was aware of the potential for danger to the child and disregarded that risk).

We have reviewed the evidence thoroughly.  The clear and convincing evidence supports the trial court's finding that the environment provided for the children, under both Mother's and Father's care, endangered the physical or

18

emotional well-being of their children. Further, the clear and convincing evidence supports the trial court's finding that each parent engaged in a course of conduct that endangered their children. Accordingly, we hold that the evidence is both factually and legally sufficient to support the trial court's termination findings under subsections 161.001(D) and (E) as to both parents. We overrule Father's two issues and Mother's second and third issues.

## IV. Jurisdiction Issue

Mother also complains that the trial judge in the 324th District Court improperly presided over the trial and hearing on Appellants' motions for new trial.

The 325th District Court of Tarrant County has continuing and exclusive jurisdiction over this matter by virtue of issuing an order establishing the parent-child relationship in November 2005. *See* Tex. Fam. Code Ann. § 155.001(a) (Vernon 2008). However, the termination proceeding was heard by Hon. Jerry S. Hennigan, presiding judge of the 324th District Court. The record indicates that there were "scheduling conflicts" that prevented the judge of the 325th District Court to hear the case. At the hearing on the motions for new trial, Judge Hennigan explained that Judge Wells of the 325th District Court had "sent out an e-mail asking somebody to hear it because of the [scheduling] issues." When Mother argued at the hearing that the motions should be heard by the 325th District Court because of its continuing, exclusive jurisdiction over the case,

19

Judge Hennigan explained that the case remained in the 325th District Court and that "the 324th is not assuming jurisdiction of this case." Mother argues that without a motion for recusal or a motion to transfer, the 324th District Court abused its discretion by hearing the case.

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). Texas law grants broad power to district courts to act for one another. *In re U.S. Silica Co.*, 157 S.W.3d 434, 439 (Tex. 2005). The Texas Constitution allows district judges to "hold courts for each other when they may deem it expedient." Tex. Const. art. v, § 11. The Texas Government Code states that judges in counties with two or more district courts "may, in their discretion, exchange benches or districts from time to time." Tex. Gov. Code Ann. § 24.303(a) (Vernon 2004). The government code also states,

> A district or statutory county court judge may hear and determine a matter pending in any district or statutory county court in the county regardless of whether the matter is preliminary or final or whether there is a judgment in the matter. The judge may sign a judgment or order in any of the courts regardless of whether the case is transferred. The judgment, order, or action is valid and binding as if the case were pending in the court of the judge who acts in the matter.

*Id.* § 74.094(a). Lastly, our rules of civil procedure state,

20

> Where in such county there are two or more district courts having civil jurisdiction, the judges of such courts may, in their discretion, exchange benches or districts from time to time, and . . . any of them may in his own courtroom try and determine any case or proceeding pending in another court without having the case transferred . . . .

Tex. R. Civ. P. 330(e).

It is therefore clear that a judge of the 324th District Court may hear and render judgment in a case of the 325th District Court, without recusal or transfer out of the 325th District Court. It was well within Judge Wells's discretion to ask Judge Hennigan to hear the case, and it was within Judge Hennigan's discretion to preside over the proceedings. Mother's first issue is overruled.

## V. Conclusion

Having overruled both of Father's issues and all three of Mother's issues, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: DAUPHINOT, WALKER, and GABRIEL, JJ.

DELIVERED: November 10, 2010

21