

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-12-00500-CV

IN THE INTEREST OF C.C., M.C., B.C. AND C.C., CHILDREN

On Appeal from the 320th District Court
Potter County, Texas
Trial Court No. 76,457-D, Honorable Don R. Emerson, Presiding

May 8, 2013

OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant, Dana, appeals the termination of her parental rights to the children, C.C.-1, M.C., B.C., and C.C.-2 and, appellant, Randy, appeals the termination of his parental rights to the children, C.C.-1, M.C., and B.C.[1]  Both Dana and Randy contend that the evidence was legally and factually insufficient to support the predicate grounds for termination and the finding that termination was in the best interest of the children.

---

[1] Appellants will be referred to as "Dana" and "Randy" and the children will be referred to by initials only.  See TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2012); TEX. R. APP. P. 9.8(b). The trial court also terminated the parental rights of the father of C.C.-2.  He has not appealed the trial court's order of termination.

Both Dana and Randy contend that the trial court committed reversible error in denying their respective motions for a mistrial and new trial.[2] We will affirm.

Factual and Procedural Background

On April 20, 2011, the subject children of this termination proceeding were taken into the custody of the Texas Department of Family and Protective Services, (Department) after a report of abuse filed by Tammy O'Dell, the Director of a Pre-K and Kindergarten school that C.C.-1 and M.C. attended. According to O'Dell, she had noticed that C.C.-1's thumbnails were black and had come off or were almost coming off. C.C.-1 reported that this was a result of actions taken by Dana's live-in boyfriend, Zeke. C.C.-1 told O'Dell that Zeke would bite C.C.-1's fingers when C.C.-1 would suck his thumb and that Zeke had slammed C.C.-1's fingers in a door when he sucked his thumb.

After the children were taken into the custody of the Department, a petition to terminate the parental rights of Dana and Randy was filed. Subsequently, the Department filed a first amended, second amended and, finally, a third amended petition to terminate the parental rights of the biological parents. The matter ultimately went to trial on the Department's third amended original petition to terminate the parental rights of Dana and Randy. In addition to alleging that termination of each parent's parental rights was in the best interest of the children, the petition, as pertinent to the jury's answers to the jury questions, alleges that Dana (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which

_____

[2] The subject matter of the motions for mistrial and new trial were identical and will hereafter be referred to as "motion for new trial."

endangered the physical or emotional well-being of the children, and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. See TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (West Supp. 2012).[3] As to Randy's conduct, the Department alleged that Randy (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; (2) constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department or an authorized agency for not less than six months and (a) the Department or authorized agency has made reasonable efforts to return the children to the father, (b) the father has not regularly visited or maintained significant contact with the children, and (c) the father has demonstrated an inability to provide the children with a safe environment; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the child or children. See id. § 161.001(1)(E), (N), (O).

Randy filed a request for a jury trial. A jury panel was convened on October 15, 2012, and the jury was empaneled to hear the evidence regarding the termination of Dana's and Randy's parental rights. After hearing from a number of witnesses, the jury, in answer to a general question, found that Dana's and Randy's parental rights should be terminated and that termination was in the best interest of the children. § 161.001.

---

[3] Further reference to the Texas Family Code will be by reference to "section _____" or "§ _____."

3

However, before the trial court could enter a judgment of termination as to each parent, both Dana and Randy filed a motion for mistrial alleging that the jury received evidence while deliberating that the trial court had previously ruled as inadmissible. The trial court denied their respective motions for mistrial. Each alleged that the trial court's denial of their motion for mistrial was error.

The trial court entered its final judgment terminating the parental rights of Dana and Randy on November 6, 2012. Thereafter, each perfected appeal. Dana contends that the evidence was legally and factually insufficient to support the jury's answers to the jury questions regarding termination and that the trial court committed reversible error in denying her motion for a new trial. Likewise, Randy contends that the evidence is legally and factually insufficient to support the jury's answers to the jury questions and the trial court committed reversible error in denying his motion for a mistrial. Disagreeing with the contentions of Dana and Randy, we will affirm the judgment of the trial court.

Standards of Review

The natural right existing between parents and their children is of constitutional dimensions. Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); see Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). A decree terminating this natural right is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child except for the child's right to inherit. Holick, 685 S.W.2d at 20. That being so, we are required to strictly scrutinize termination proceedings. In re G.M., 596 S.W.2d 846, 846

4

(Tex. 1980). However, parental rights are not absolute, and the emotional and physical interests of a child must not be sacrificed merely to preserve those rights. In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).

The Texas Family Code permits a court to terminate the parent-child relationship if the petitioner establishes (1) one or more of the enumerated acts or omissions and (2) that termination of the parent-child relationship is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001. Though evidence may be relevant to both elements, each element must be proved, and proof of one does not relieve the burden of proving the other. See In re C.H., 89 S.W.3d at 28. While both a statutory ground and best interest of the child must be proved, only one statutory ground is required to terminate parental rights under section 161.001. In re A.V., 113 S.W.3d 355, 362 (Tex. 2003). Therefore, we will affirm the trial court's order of termination if legally and factually sufficient evidence supports any one of the grounds found in the termination order, provided the record shows also that it was in the best interest of the child for the parent's rights to be terminated. See id.

Due process requires the application of the clear and convincing standard of proof in cases involving involuntary termination of parental rights. In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see § 161.206(a) (West 2008). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007 (West 2008). This standard, which focuses on whether a reasonable jury could form a firm belief or conviction, retains the deference a reviewing court must have for the factfinder's role. In re C.H., 89 S.W.3d at 26. We must maintain

5

appropriate deference to the jury's role as factfinder by assuming that it resolved evidentiary conflicts in favor of its finding when reasonable to do so and by disregarding evidence that it reasonably could have disbelieved.  See In re J.F.C., 96 S.W.3d at 266.

In reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established.  See id.  "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so."  Id.  In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.  Id.

When reviewing the factual sufficiency of the evidence supporting a termination order, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations."  In re C.H., 89 S.W.3d at 25.  In conducting this review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding.  In re J.F.C., 96 S.W.3d at 266.  "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."  Id.

Dana's Predicate Acts or Omissions

Dana's parental rights were terminated after the jury found that she had knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. § 161.001(1)(D). Further, the jury also found that Dana had engaged in conduct which endangered the physical or emotional well-being of the children. § 161.001(1)(E). The common theme in these two statutory predicates is the term "endangers." Endanger means to expose to loss or injury or to jeopardize. In re I.G., 383 S.W.3d 763, 770 (Tex.App.—Amarillo 2012, no pet.).

Under subsection (D), the focus is on the child's living environment and not the parent's conduct, parental conduct, however, may produce the endangering environment. See In re D.R.J., No. 07-08-00410-CV, 2009 Tex. App. LEXIS 5231, at *7 (Tex.App.—Amarillo 2009, pet. denied). Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." Id.; see In re P.E.W., 105 S.W.3d 771, 777 (Tex.App.—Amarillo 2003, no pet.) (observing that child "need not develop or succumb to a malady" in order to prove endangering conditions).

In reviewing a termination under subsection (E), the focus is on the conduct of the parent: did the Department prove by clear and convincing evidence that the parent engaged in conduct that endangered the child's physical or emotional well-being? See In re D.R.J., 2009 Tex. App. LEXIS 5231, at *8. It is noteworthy that, under subsection

(E), we review not only active conduct by the parent but also omissions of the parent. Id.

Testimony at Trial

During the trial, the jury heard from a number of witnesses regarding Dana's abilities as a parent and the condition of the children, both upon removal from the home and subsequently. The jury heard the following evidence regarding Dana and the children.

O'Dell was the director of the school that C.C.-1 and M.C. attended. O'Dell noted that each child was subject to emotional outbursts at school and these would be more pronounced if the child seemed to think the parents were being called. O'Dell was the first person to note the anomaly regarding C.C.-1's blackened thumbs. C.C.-1 made an outcry to O'Dell that the injuries to his nails were the result of Zeke biting C.C.-1's nails and slamming a door on them as a type of corrective action because C.C.-1 was sucking his thumb. O'Dell testified that since M.C.'s removal, she no longer suffers from emotional outbursts.

Clarissa Williams was assigned as caseworker and had worked at length with Dana. In testifying about the general appearance of the children on the day of the removal from Dana's care, she stated they were pale and almost gaunt looking. All of the children had lifeless-looking eyes. As a general matter, Williams opined that Dana made efforts to comply with the service plan that the Department had provided. There were still issues, particularly with stable housing as Dana had lived in three different addresses during the time service was provided.

In regards to C.C.-1, Williams noticed that when C.C.-1 was removed from the home his thumbnails were missing. They have subsequently grown back. Further, she testified that initially C.C.-1 was withdrawn and appeared to be frightened; however, since removal he has become talkative and would visit with her.

Williams had the opportunity to observe Dana's visits with the children on several occasions. In describing these visits, Williams stated that the children did not seem to want to visit with Dana, with the exception of B.C., who was a toddler. C.C.-1 and M.C. would enter the room, ignore Dana, and go straight to the toys. At the five-minute warning to conclude the visits, the children would simply get up and go stand at the door waiting for time to leave.

In addition to the seeming lack of interests in visiting with Dana, Williams observed that the children would have significant emotional outbursts or incidents before and after visiting with Dana. On several occasions, Williams observed what she described as "meltdowns" by the children immediately before going in for visitation. Williams opined that these "meltdowns" indicated that the children did not want to visit with Dana. M.C. had on more than one occasion urinated on herself during the visitation. On one such occasion, she had gone to the restroom immediately before entering the visitation room. Williams observed that C.C.-1 would tend to revert to baby talk after a visit. M.C. became, in Williams's words, almost animal-like, howling and barking after visits. B.C., who seemed most bonded with Dana, had no problems before the visits; however, after visits with Dana, he became extremely aggressive and would strike out at those around him. Even C.C.-2, the youngest child, demonstrated a lack of

bonding with Dana as he would simply go to the door and stand and wait for it to open when the visit was over.

Lynn Jennings, a licensed professional counselor, testified regarding outcries of abuse C.C.-1 and M.C. made to her about Zeke. C.C.-1 advised Jennings about Zeke having grabbed him by the genitals, whipping him hard with a paddle, and biting C.C.-1's thumbs. Zeke also warned C.C.-1 not to tell any adult about these incidents. As a result of C.C.-1's bedwetting, Zeke would give him cold showers as punishment. M.C. also advised Jennings regarding these cold shower treatments. Further, C.C.-1 and M.C. advised that Dana was present and would do nothing to stop it. According to C.C.-1, Dana was also present when Zeke had bitten his nails and she did nothing, just sat watching television. For punishment, Zeke would also force C.C.-1 to wear a dress in front of the family, including Dana. As a result of this type of activity, C.C.-1 did not trust adults and after beginning his visits with his parents, Jennings had to increase the frequency of her sessions with him.

Lee Ann Lefevre, a licensed professional counselor, testified about her observations of Dana's visits with the children. As a general matter, she described the visits as disorganized. She observed that the only child who appeared to want to visit with Dana was B.C.; the other children seemed to ignore Dana's attempts to engage them when they entered the visitation room and went straight for the toys. Lefevre gave some specific guidance to Dana about how to engage the children and, on a subsequent visit, observed Dana attempting the techniques she had recommended. However, the children, with the exception of B.C., continued to ignore Dana and had very little interaction with her. After observing the children during visitation, Lefevre

10

stated that the children had a disorganized attachment style toward their mother. This means that the interaction between the parent and the child tends to be bizarre. Lefevre testified that, in approximately 80% of the cases where the children display this type of attachment style, there have been previous incidents of abuse. Lefevre was able to give specific examples of the bizarre behavior she observed during the visitation.

During follow ups after the visitation, Lefevre learned that the children's behavior almost always digressed following a visit with Dana. Further, she learned from B.C. about Zeke's harming C.C.-1 and that Dana was present but did nothing to stop it. B.C. informed Lefevre that there was never enough food at the house and that B.C. sometimes was hungry.

In summing up her observations, Lefevre gave Dana credit for trying to implement the various techniques she had recommended. However, Lefevre was of the opinion that Dana is simply not able to care for the children as her parenting skills were not a good match for these children who demonstrated special needs.

Dr. Edwin Basham, clinical psychologist, then testified regarding a psychological evaluation he did on Dana. As part of the evaluation of Dana, Basham spent a significant amount of time interviewing Dana. During the interview with Dana, the subject of Zeke's treatment of her children was explored. According to Basham, Dana felt no responsibility about what had happened to the children or the reason the family had gotten involved with the Department. Basham opined that Dana seemed to express no reality of the need to alter the way she parented or an ability to prevent the children from suffering harm from the partners Dana elected to live with.

Dana testified regarding the events leading up to the removal of the children. Basically, Dana admitted knowing that Randy, father to C.C.-1, M.C. and B.C., had abused another child of Dana's from a previous relationship and was ultimately sent to prison for that offense. She affirmed that she choose to remain with him after the incident. Dana also admitted knowing the Zeke had abused his own children but denied knowing anything about abuse of her children. Specifically, Dana knew C.C.-1's thumbs had become injured but denied knowing that Zeke had anything to do with the injury. Dana admitted that this was her third involvement with the Department but countered by explaining that, this time, there were services available that she had not had access to previously.

Gregory Lusk, the foster father for M.C. and B.C., testified that he initially became involved with the children as a bus driver for the Sunday school bus at the church where C.C.-1 and M.C. went to preschool. He described visiting the home of the children on two occasions and, on each visit, the home was very dirty and filthy with debris scattered all over, inside and out.

In reference to the appearance of the children, Lusk stated that the children were ill-kept, dirty, and generally appeared a bit malnourished. Lusk observed M.C. on several occasions with what appeared to be fecal matter smeared on her clothes. B.C. always appeared in a diaper that was dirty and appeared full. C.C.-1 appeared ill-kept, dirty and smelled of urine.

Dawnette Lusk, the foster mother, affirmed Gregory's testimony regarding the children always appearing dirty. She testified about an incident when Dana and the

children were living in a hotel. Dawnette went to the hotel to take the children so they could get out of the hotel for a few hours. When she picked the children up there were no diapers or cups for the children. Dana explained that she had packed all of those items and they were not available. Dawnette observed that the younger children had not had their diapers changed for several days and all of them appeared to be wearing the same clothing for several days.

M.C. and B.C. came to live with Greg and Dawnette in April 2011. When B.C. arrived, he had a large distended stomach that was very hard. When it came time for a bath, Dawnette testified that the children were extremely frightened and ran through the house screaming. The children kept saying that the water was going to be cold. It took two or three weeks, according to Dawnette, to convince the children that the water would be fine. Upon arriving at Dawnette's home, the children ate their meals with their hands, placing food in their mouths quickly as if in fear there would not be enough.

Dawnette testified as to her observations of the children before and after they visited Dana. Before one of the early visits, Dawnette told the children they were going to visit and the children began crying saying they did not want to go back to their old house, the "scary house." After the visits with Dana, Dawnette related that M.C. would have episodes of urinating her clothes. B.C. reacted to the visits by acting out and becoming extremely aggressive. After the visitation stopped, Dawnette testified, the emotional outbursts from M.C. and B.C. had essentially stopped.

Heather Smith was the original foster mother of C.C.-1. He suffered from extreme episodes of emotional insecurity and physical aggression. During his

13

outbursts, C.C.-1 would lash out at those around him. As with the other children, C.C.-1 was obsessed about food and was found to hoard food under his bed. Like the other children, C.C.-1 was afraid of baths and had voiced fear that the water would be cold.

Smith noted that prior to visits with Dana, C.C.-1 would appear fearful and worried. He expressed gratitude at the conclusion of each visit that Heather had come to pick him up. Smith testified that there would usually be episodes of bedwetting and emotional outbursts and acting out in the days following visits. After one visitation session, C.C.-1 became so angry that he struck a window in a door hard enough to shatter the window. It was at this point that Smith and her family decided that C.C.-1 needed more structure than they could provide, and he was subsequently placed at the Lubbock Children's Home.

Tiffany Brown was the foster mother for C.C.-2, the youngest of the children. He was 14 months old when he came to live with Brown's family. When C.C.-2 arrived, he was very thin and frail, with dark circles under his eyes. He appeared jaundiced-looking, with his hair falling out in clumps. Upon arriving at the Brown's home, C.C.-2 could not speak and showed no emotion; in fact, Brown described him as emotionally flat. Over many months and significant therapy, C.C.-2 finally began to react like a normal toddler. When C.C.-2 visited with Dana, Brown reported that he would wake up screaming in the night after the visits and be unable to go back to sleep unless Brown held him. C.C.-2's behavior began improving when the visits ceased.

Dana's Contentions

Dana contends that the evidence is legally and factually insufficient to support the jury's answers because subsection (D) inquiry should look only to the living conditions or surroundings and in general does not apply to the conduct of the parent toward the child. See In re J.A.J., 225 S.W.3d 621, 627 (Tex.App.—Houston [14th Dist.] 2006), (aff'd in part, rev'd in part, 243 S.W.3d 611 (Tex. 2007)); In re S.H.A., 728 S.W.2d 73, 84-85 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). Dana then posits that there is no evidence of the specifics regarding the Department's taking possession of the children. The only evidence regarding conditions came subsequent to the removal of the children. Regarding subsection (E), Dana contends that the only evidence before the jury was that Zeke, her live-in boyfriend, had abused Dana's children by giving them cold baths as punishment, biting C.C.-1's nails, and forcing C.C.-1 to dress in girls' clothing. Dana's position is that since she testified that she did not know of these events, except the dressing of C.C.-1 in girls' clothing, the evidence is legally and factually insufficient to prove a violation of subsection (E) by clear and convincing evidence. Apparently, the situation regarding dressing C.C.-1 in girls' clothing is either not enough, according to Dana's theory, or is insufficient because she testified she did not approve and told Zeke to not do it again. Dana's position ignores the role of the fact finder.

Analysis of Termination Under Section 161.001(1)(D) & (E)

From the evidence presented to the jury, we learn that Dana was raising her children in surroundings that were chaotic, at best, and extremely unhygienic and filthy,

at worst. Further, the personal hygiene of the children was extremely bad: fecal matter on clothes, infants with full diapers, urinating on themselves, and then not bathing. Further, it appeared that there was rarely enough food in the house, as demonstrated by the children's preoccupation with the amount of food in the foster parents' homes. Additionally, the jury heard testimony about incidents of abuse by Dana's live-in boyfriend. And, finally, the jury heard testimony regarding emotional condition of the children, which is demonstrated by the testimony of the foster parents concerning how the children reacted when they were first removed from the home. Further evidence of the emotional condition of the children is provided by the counselors' and foster parents' testimony regarding the reaction of the children to visits with Dana. When a party alleges multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points or issues that would afford the party the greatest relief. See In re K.W., 138 S.W.3d 420, 428 (Tex.App.—Fort Worth 2004, pet. denied). Accordingly, we will address Dana's legal sufficiency argument first.

Analysis

When the evidence is reviewed in the light most favorable to the jury's answers to the questions, as it must be in a legal sufficiency review, we are convinced that the jury could have formed a firm belief or conviction that Dana knowingly placed or allowed her children to remain in conditions, or engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. See § 161.001(1)(D), (E); In re J.F.C. 96 S.W.3d at 266. In assessing the factual sufficiency question under subsections (D) and (E), we review all the evidence to determine whether the disputed evidence is such that a

16

reasonable factfinder could not have resolved the disputed evidence in support of its finding. See id.

Our review of the evidence demonstrates that the jury heard a substantial amount of evidence about Dana's actions, lack of actions, and effects of her actions and lack of actions on the children. Understanding that some of the evidence was in conflict, it remains the province of the jury to resolve those conflicts, as long as their resolution is reasonable. See In re I.G., 383 S.W.3d at 771. We are convinced that the jury, when resolving any conflicts in the testimony about what Dana knew or did not know, could reasonably form a firm conviction or belief that supported its answers to the questions regarding subsections (D) and (E). See In re C.H., 89 S.W.3d at 25.

We are mindful of the reasons Dana suggests that the evidence is legally and factually insufficient. Turning first to Dana's contentions regarding subsection (D) and the cases she cites therein, we first observe that the cases are cited for an extremely broad proposition that the factual patterns of the cases do not support. In re J.A.J. does, in fact, contain language to the effect that the reviewing court must look at the conditions and surroundings of the child and not specifically at the conduct of the parent. In re J.A.J., 225 S.W.3d at 627. However, in footnote 7 of the opinion, the court notes, "We agree that the *conduct* of parents or others in the home, generally, can produce dangerous surroundings or circumstances to support termination under subsection (D)." Id. at 626 n.7. A review of the cases cited by In re S.H.A. reveals that those courts were looking at the parent's conduct in light of its effect on the conditions and surroundings of the child. In re S.H.A., 728 S.W.2d at 84-85. There is nothing in either case that would instruct us not to consider the parent's conduct as it applies to

17

the conditions and surroundings of the child. Finally, Dana's argument that the Department did not know of the condition of the home until after removal may or may not be true; however, it is immaterial, and, Dana does not cite the Court to any cases that hold that discovery of such information after the act of removal means that the evidence of such conditions or surroundings cannot be considered.

As to Dana's arguments regarding subsection (E), the jury heard the conflicting testimony: the children's testimony that Dana was aware of each episode and did nothing to stop it as opposed to Dana's testimony that she did not know. The jury resolved the issue against Dana. We are mindful of our responsibility in reviewing a record on appeal to give the appropriate deference to the factfinder. See In re J.F.C., 96 S.W.3d at 266–67. That the jury legitimately discounted Dana's testimony is supported by a number of other facts not referred to by Dana. First, Dana did admit that, when she and Randy were married, she knew he had abused her daughter by a previous marriage, yet she stayed with him. Dana further testified that this was her third time to be involved with the Department. From this evidence, the jury was within its reasonable bounds to reject Dana's conflicting testimony. See In re I.G., 383 S.W.3d at 771.

Because we find that the evidence is both legally and factually sufficient to sustain the jury's findings regarding violation of the predicative events in subsections (D) and (E), we overrule Dana's first two points of error.

## Randy's Predicate Acts or Omissions

Randy's parental rights were terminated based upon the jury's answers to questions. Specifically, the jury found that Randy had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. See § 161.001(1)(E). Additionally, the jury found that Randy had constructively abandoned the children who had been in the permanent managing conservatorship of the Department for not less than six months and (1) the Department had made reasonable efforts to return the children to Randy, (2) Randy had not regularly visited or maintained significant contact with the children, and (3) Randy had demonstrated an inability to provide the children with a safe environment. See § 161.001(1)(N). Finally, the jury found that Randy had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children. See § 161.001(1)(O). Randy attacks the sufficiency of the evidence to support the findings of the jury without specifying whether the evidence is legally or factually insufficient. A review of the standard of review proposed by Randy does not provide any insight into which of the evidentiary insufficiencies he is truly challenging. The Department, apparently out of an abundance of caution, addresses the sufficiency questions from both the perspective of legal and factual sufficiency. We will do likewise.

## Standard of Review

Inasmuch as Dana's claims were also couched in terms of legally and factually insufficient evidence, we refer the reader to the standard of review set forth there.

The judgment of the trial court finds that the termination of Randy's parental rights was proven by clear and convincing evidence on each of the multiple grounds alleged by the Department. §161.001(1)(E), (N), (O). As a reviewing court, we may sustain the judgment of the trial court if the evidence is sufficient to support a single predicate ground for termination. In re A.V., 113 S.W.3d at 362.

Testimony at Trial

Clarissa Williams testified as the caseworker and stated that the Department had developed a service plan for Randy to achieve reunification with the children. Among the aspects of the plan that Randy either did not do or failed to provide proof of completion were obtaining a psychological evaluation, completion of ACADA, and obtaining stable housing. Although Randy told the caseworker he had completed the ACADA program, proof was never offered. Through Williams's testimony, we learned that Randy advised the Department that he would be living at the residence of his grandmother in Dumas, Texas, yet the Department was never able to verify this address as Randy's residence and was never able to contact Randy at this address. Williams testified that she has attempted on numerous occasions to contact Randy at this address and has never succeeded. Additionally, the service plan had a visitation component, and Randy began visitation January of 2012. However, the record reflects that Randy ceased attempting to visit with the children in March 2012. One child, C.C.-1, was moved to Lubbock Children's Home and the record reflects that Randy admitted he never attempted to visit the child at that location. After C.C.-1's removal from the immediate area, M.C. and B.C. refused to enter the visitation room to visit Randy. Further, Williams testified that Randy has not maintained contact with the Department or

20

his children.  Upon cross-examination, Williams admitted that Randy had completed numerous portions of the Department's service plan.

Lynn Jennings, a licensed professional counselor, testified that after C.C.-1's visit with Randy and Dana on January 5, 2012, she was called into an emergency counseling session with C.C.-1.  While visiting with the child about the precipitating events, she learned that C.C.-1 was very angry because it was his sixth birthday and Randy had forgotten it.  Jennings testified that, after a visit with Randy in February 2012, M.C. advised that she no longer wished to visit Randy.  During a subsequent counseling session, M.C. advised Jennings that Randy "was scary and smells like smoke really bad and he's not nice."

Foster mother, Dawnette Lusk, testified about taking M.C. and B.C. to visit with Randy.  She stated she was faithful in taking the children to visit but, after the first or second visit, M.C. refused to go in.  As to B.C., Dawnette testified that he was okay at first, for the first two or three visits, then, suddenly and without explanation, he refused to go into the room to visit with Randy.

Foster mother, Heather Smith, testified about how C.C.-1 reacted to visitation with Randy.  The exhibition of emotional acting out and aggression that seemed to follow C.C.-1's visits with Dana became even worse after he began visiting with Randy. Smith testified that it was after the February 2012 visit with Randy that C.C.-1 became so violent and out of control that an emergency session with his counselor, Jennings, had to be scheduled, which subsequently led to C.C.-1's temporary placement at the Pavilion residential treatment facility.

In a general nature, the testimony at trial was that all of the children had improved significantly since their placement with the various foster families and agency. It is of note that much of the improvement has occurred since the children ceased visitation with the natural parents.

Randy's testimony was that he desired to have his children returned to him. He disputed some of the previous testimony regarding whether or not he had completed the service plan as provided by the Department. His contention was that he had not acquired the psychological evaluation because he could never get scheduled. Randy contended that he tried to call Basham 10 or 12 times. Basham testified that his recollection was that Randy called once or twice to get an appointment. Basham further explained that all referrals from the Department are told they must consistently and persistently attempt to get their appointment scheduled. Randy further denied he failed to stay in touch with the Department. By his testimony, he tried to call the Department many times but never got through, or, if he got through, he was forced to leave a message and no one ever returned his call. However, Randy was less definite on his plans for the children. When quizzed about how he would take care of the children, he admitted that he currently worked too many hours to be able to look after them. He opined that his relatives would be willing to help. However, he was not able to provide any specifics about this help.

During the examination of Randy, he admitted that he pleaded guilty to the offense of injury to a child and was placed on deferred adjudication community supervision. Subsequently, he was adjudicated guilty and sentenced to serve 4 years in the Institutional Division of the Texas Department of Criminal Justice (ID-TDCJ) on May

27, 2009. At the time Randy was sentenced to prison, C.C.-1 was three years old, M.C. was two, and B.C. was nine months old. Randy testified that he served two and one-half years of the sentence, had been released from prison November 10, 2011, and, at the time of the trial, was still on parole. Additionally, Randy testified about having two other convictions for State Jail Felony offenses and some other misdemeanors. Randy's involvement with the Texas Department of Criminal Justice began in 1999 and went until his release on parole in 2011.

Analysis

One of the predicate grounds for termination alleged by the Department and submitted to the jury was subsection (N) which permits termination when the parent has constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department for not less than six months and:

(I) the Department has made reasonable efforts to return the child to the parent;

(II) the parent has not visited or maintained significant contact with the children and,

(III) the parent has demonstrated an inability to provide the child with a safe environment.

§ 161.001(1)(N).

The record before the Court shows that the children were taken into the custody of the Department on April 20, 2011. Trial was held on this case beginning on October 15, 2012. Therefore, there can be no question that the children had been in the

23

conservatorship of the Department for more than six months. See id. In fact, Randy does not contest that issue.

Turning to the question of whether the Department made reasonable efforts to return the children to Randy, the record demonstrates that the Department did enact a service plan for Randy. Department caseworker Williams testified about various components of the service plan that Randy had either completed or, in her opinion, failed to complete. These included the failure to complete the psychological evaluation, the completion of individual counseling and parenting classes, the failure to keep the Department apprised of his address, and other aspects of the plan. From this record, it is clear that the Department had a service plan. Likewise, the record before us shows that Randy began visitation with the children in January of 2012. Initially, while the oldest child, C.C.-1 was still in the Amarillo area, the visitation seemed to go well. However, after C.C.-1 started having significant emotional episodes that resulted in his being removed from the foster home and eventually placed in the Lubbock Children's Home, Randy's visitation with the other children became more strained and less fruitful. The record reflects that there was a real question of whether Randy had ever bonded with the younger children. By March of 2012, Randy, by his own testimony, had become frustrated with the fact that the younger children did not want visitation and ceased attempting to visit with the children. Further, the record demonstrates that Randy never attempted to visit with C.C.-1 in Lubbock. Thus, this record is directly related to parts (i) and (ii) of subsection (N).

First, based upon the record, it is clear that the Department has made reasonable efforts to return the children to the parent. See § 161.001(1)(N)(i); In re

24

<u>N.R.T.</u>, 338 S.W.3d 667, 674 (Tex.App.—Amarillo 2011, no pet.) (observing that implementation of a service plan by the Department ordinarily considered a reasonable effort to return the child to its parent). As to subsection (N)(ii), the record is equally clear that Randy has not had significant contact with nor visited the children since March 2012. The record reflects that since his release from prison, Randy has had visitation with the children on a limited number of occasions. Yet, when faced with difficulty in exercising his visitation because the children expressed a desire to not visit, instead of trying to work through the problem, Randy simply quit and opted to not exercise visitation. Neither has Randy attempted to contact the children. Especially telling is the fact that, as to C.C.-1, the child with whom he was most bonded, Randy never attempted to contact the child in Lubbock. Therefore, the Department has satisfied its requirement to prove part (ii) of subsection (N). <u>See id</u>. We are left with the question of the evidence to support part (iii), the parent has demonstrated an inability to provide the child with a safe environment.

The record before the Court demonstrates that Randy has been incarcerated three times in the ID-TDCJ and a couple of times elsewhere for misdemeanors. The offense for which he is on parole is injury to a child, and the child victim was living in the home with Randy and Dana prior to the incident for which he was convicted. Since being released on parole, he has ostensibly been residing with his grandmother in Dumas, Texas, yet the Department has never been able to contact him there. There is no testimony regarding the size of the grandmother's home in Dumas, if, in fact, that is where Randy wishes to reside with the children. Likewise, there is no testimony in the record that Randy has acquired or has any definitive plans to acquire any other type of

suitable housing. As to his employment, Randy testified he has been gainfully employed since being released on parole. In fact, his claim is that he works 12 to 13 hours per day, yet he provided the court with no pay stubs or testimony verifying his employment. Assuming that Randy does work the number of hours per day to which he testified, his testimony regarding a plan to take care of his children while he worked was limited to the fact that he has relatives living in Dumas and, as Randy surmised, "I don't think any of them would have a problem watching my kids while I was at work." Yet, absent from the record is any testimony by anyone that this is a viable option and that there are individuals willing to watch the children. Finally, Randy testified that he had plans, at the time of trial, of getting back together with Dana. In light of the testimony regarding Dana's standing by while her children were being physically and emotionally abused, Randy's statement about future intentions was something the jury could turn to in deciding whether Randy could provide the children with a safe environment. Since getting out of prison, Randy has, by his own testimony, not provided any support for the children; he reasoned that the Department had custody, and he figured they would provide for them.

Randy gave testimony at odds with that of the Department's witnesses. Specifically, he claimed that he had stayed in touch with the Department. Further, Randy contended that his failure to complete his psychological evaluation was due to the fault of Basham and Basham's appointment process. Randy testified that he tried to make an appointment at least 10 times, even though Basham testified that Randy only called once or twice. Finally, Randy claimed to have a stable place to live, yet the Department's testimony was that they were never able to contact Randy at his

grandmother's home. As for employment, Randy said he was gainfully employed working 12-13 hours a day and gave the name of his employer. Yet, he produced no pay stubs and no one testified to verify his employment. In light of the totality of the record, it was the province of the jury to reconcile these various conflicts in the testimony, and we may not second guess their decision. We are mindful of our responsibility in reviewing a record on appeal to give the appropriate deference to the factfinder. See In re J.F.C., 96 S.W.3d at 266–67.

After reviewing all of this evidence in a neutral light we are convinced that the record supports by clear and convincing evidence a finding that Randy has demonstrated an inability to provide the children with a safe environment. See § 161.001(1)(N)(iii); In re M.C.,300 S.W.3d 305, 310 (Tex.App.—El Paso 2009, no pet.); In re J.J.O., 131 S.W.3d 618, 630 (Tex.App.—Fort Worth 2004, no pet.). Accordingly, the evidence is both legally and factually sufficient to sustain the jury's verdict. See In re J.F.C., 96 S.W.3d at 266; In re C.H., 89 S.W.3d at 25. Inasmuch as only one statutory ground is required to terminate parental rights under section 161.001, In re A.V., 113 S.W.3d at 362, we need not consider Randy's other contentions.

Best Interest of the Children

In response to a jury question, the jury found that it was in the best interest of the children that parental rights of Dana and Randy be terminated. Both contest the legal and factual sufficiency of the evidence to support this finding. We will apply the same standard of review to the question of the legal and factual sufficiency of the evidence to support the jury's answer regarding the best interest of the children that we have

27

previously applied to the predicate acts or omissions review.  See In re J.F.C., 96 S.W.3d at 266–67 (for legal sufficiency) and In re C.H., 89 S.W.3d at 25 (for factual sufficiency).

Applicable Law

The Texas Supreme Court has recognized a non-exhaustive list of factors that are pertinent to the inquiry whether termination of parental rights is in the best interest of the child: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.  See Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976); see also TEX. FAM. CODE ANN. § 263.307 (West 2008) (providing extensive list of factors that may be considered in determining child's best interest).  In examining the best interest of the child, we may consider evidence that was also probative of the predicate act or omission.  See In re C.H., 89 S.W.3d at 28.  The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence.  In re N.R.T., 338 S.W.3d at 677.  The Department need not prove all nine Holley factors, and the absence of evidence relevant to some of those factors does not bar a finding that termination is in the child's best interest, especially in the face of undisputed evidence that the parental relationship

28

endangered the child. See In re C.H., 89 S.W.3d at 27. No one Holley factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. In re A.P., 184 S.W.3d 410, 414 (Tex.App.—Dallas 2006, no pet.)

Dana's Issue

The essence of Dana's argument is that the evidence demonstrates that she loves her children and is insufficient to overcome the strong presumption that the best interest of the children would be served by keeping custody of the children with the natural parent, Dana. See In re D.M., 58 S.W.3d 801, 814 (Tex.App.—Fort Worth 2001, no pet.). Specifically, Dana points to the testimony of the counselor Lefevre who testified that in three sessions with Dana, she identified steps for Dana to take and that Dana tried to implement them. Additionally, Dana points to the testimony of the Department's caseworker, Williams, who testified that Dana had visited numerous times with her children and had completed her services in the case. Finally, Dana points to the testimony of Dr. Schneider, a psychologist that Dana hired to perform an updated psychological examination. Dr. Schneider testified that Dana had gone the extra mile in an effort to do what was necessary to maintain her parental rights.

However, Dana's contentions overlook the evidence the jury heard regarding the predicative events. Specifically, the jury heard testimony regarding the physical and emotional abuse of the children by Zeke while Dana was present and failed to prevent it. See In re C.H., 89 S.W.3d at 28. This testimony goes directly to the third Holley factor, the emotional and physical danger to the children, now and in the future, and the

eighth Holley factor, the acts or omissions of a parent, indicating the existing parent-child relationship is not a proper one. See Holley, 544 S.W.2d at 371–72. Likewise, the jury heard the testimony of the foster parents and counselors regarding the progress the children have made and from counselors and Dr. Basham regarding Dana's lack parenting ability. This testimony supports termination as being in the best interest of the children under the second and fourth Holley factors. Specifically the testimony is directly reflective of the second Holley factor, the emotional and physical needs of the child now and in the future, and the fourth Holley factor, parental abilities of the individuals seeking custody. Further, all the relevant testimony at trial supported the proposition that the children began to improve dramatically when visitation with Dana ceased. This evidence supports termination under the first factor, which focuses on the desires of the children and the second factor, which focuses on the emotional and physical needs of the children now and in the future. Altogether, when the totality of the evidence is reviewed through the prism of the light most favorable to the jury's findings, the evidence is legally sufficient. See In re J.F.C., 96 S.W.3d at 266. This same evidence reviewed in a neutral light, is also factually sufficient to support the jury's answer to the best interest question. In re C.H., 89 S.W.3d at 25.

Randy's Issue

Randy contends that he presented evidence that the jury should have believed to the effect that he completed his service plan and those portions that were not completed were not completed through no fault of his own. Further, Randy contends that he demonstrated his commitment to his children by his plans for their future by maintaining steady employment and stable housing. Finally, Randy simply asserts that the

30

Department presented no evidence that it was in the children's best interest that his parental rights be terminated.

Looking at Randy's last statement first, we note that the evidence regarding the predicative event may also be considered in reviewing the sufficiency of the evidence to support a best interest finding. See In re C.H., 89 S.W.3d at 28. Randy's assertion simply ignores that fact. As to the issue of the stability of Randy's employment and housing, the record reflects two things. First, Randy did testify that he had steady employment; however, when asked to provide pay stubs, he declared he was paid in cash and could not provide any pay receipts. Second, he did not provide any other testimony that supports his declaration of gainful employment. The Department, on the other hand, presented testimony that throughout the proceedings it had not been able to verify Randy's employment. In a like vein, Randy says he has been living with his grandmother in Dumas. Yet, throughout the proceedings the Department has never been able to contact Randy at that address. It was, therefore, the exclusive province of the jury to resolve this conflict in the testimony. See In re J.F.C., 96 S.W.3d at 266–67. By its answer to the jury question, the jury seems to have resolved the conflicting testimony against Randy.

Additionally, there is the issue of Randy's criminal past. Between 1999 and his release from prison in 2011, Randy was incarcerated in prison three times. While it is true that simply being imprisoned does not necessarily mean it is in the children's best interest that the parent-child relationship be terminated, it is certainly a factor the jury may consider, especially as it bears upon the stability of the children. See In re C.T.E., 95 S.W.3d 462, 466 (Tex.App.—Houston [14th Dist.] 2002, pet denied) (in determining

31

the weight of this factor, courts may consider whether the criminal activity has endangered the safety of the children). In the case before the Court, Randy's last criminal activity was injury to a child; accordingly, this factor will weigh heavily against Randy.

Turning to other Holley factors, there is the question of the desires of the children. Through evidence from counselors and foster parents, it has been established that the children did not want to visit with their parents and that all of them, except C.C.-1, refer to their foster parents as "Mom" and "Dad." Accordingly, the first Holley factor weighs in favor of termination. Likewise, the testimony regarding the improvement of the children since removal and especially since a cessation of visitation with both parents weighs in favor of termination under the second Holley factor, the emotional and physical needs of the child now and in the future. In the final analysis when all the evidence is weighed, both neutrally and in the light most favorable to the jury's findings, it is sufficient to prove by clear and convincing evidence that terminating Randy's parental rights is in the best interest of the children. In re J.F.C., 96 S.W.3d at 266 (legal sufficiency); In re C.H., 89 S.W.3d at 25 (factual sufficiency). Accordingly, Dana's and Randy's issues to the contrary are overruled.

## Motion for New Trial

Next, Dana and Randy contend that the trial court committed reversible error when it denied their respective motions for new trial.[4] The error, according to Dana and

---

[4] The record reflects that Dana and Randy each initially filed a document styled a motion for mistrial. The trial court conducted a hearing and denied that motion and then

Randy, revolved around the inadvertent inclusion within the Department's service plans, proposed Exhibits 3 and 4, of an investigative report that the trial court had ruled inadmissible at a pre-trial hearing on October 10, 2012. When the documents were offered, the Department was instructed to redact the investigative report. The record does not demonstrate that the trial court ever admitted Exhibits 3 and 4 into the record. Yet, later, when the jury retired to deliberate, these two exhibits were allegedly taken into the jury room with the unredacted investigative report still attached. The presiding juror, Stacy Tormey, testified that the exhibits were read by the jury but only after an initial poll of the jury revealed that the jury was split, 10 in favor of termination and 2 against termination as to Dana. Tormey indicated that there was never a preliminary vote taken as to Randy. Tormey further testified that the preliminary poll of jurors was conducted after the trial court had read the charge to the jury. The exhibits at issue, according to Tormey, did not even mention Randy at all and had nothing to do with the decision to terminate as to Randy.

Standard of Review

We review the trial court's denial of a motion for new trial based on jury misconduct for an abuse of discretion. In re J.H.M., No. 07-07-00109-CV, 2009 Tex. App. LEXIS 9886, at *18 (Tex.App.—Amarillo Dec. 29, 2009, no pet.) (mem. op.) (citing Pharo v. Chambers Cnty, 922 S.W.2d 945, 948 (Tex. 1996)).

---

entered judgment. Subsequently, each have filed a motion for new trial and rely upon the record from the motion for mistrial hearing to support their respective positions.

Analysis

In order to demonstrate a right to a new trial based upon jury misconduct, Dana and Randy must establish that (1) the misconduct occurred; (2) the misconduct was material; and (3) based on the record as a whole, the misconduct probably resulted in injury to Dana and Randy, respectively. See id. It is as to the third requirement that Dana and Randy fail to meet their burden. This is so because the record does not contain Exhibits 3 and 4. Therefore, this Court cannot ascertain whether the information in the exhibits at issue resulted in injury to Dana and Randy. Id. Accordingly, we overrule Dana's and Randy's respective fourth issues.

## Conclusion

Having overruled all of Dana's and Randy's issues, we affirm the judgment of the trial court terminating their individual parental rights.

Mackey K. Hancock
Justice